Christopher R. Pitoun (SBN 290235)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 N. Lake Ave., Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
christopherp@hbsslaw.com

Steve W. Berman (*pro hac vice* to be filed)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

*Attorneys for Plaintiffs*
[Additional counsel listed on the signature page]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

LESLIE FLAHERTY, ROBERT FOCKLER, DONALD HOUSE, DAVE LOOMIS, ARRON MILLER, TRACI MOORE, MARK RICE, and JAMES SMITH, individually, and on behalf of all others similarly situated,

Plaintiffs,

v.

HYUNDAI MOTOR COMPANY, HYUNDAI MOTOR AMERICA, KIA MOTORS CORPORATION, and KIA MOTORS AMERICA, INC.,

Defendants.

No.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ..... 1
II. JURISDICTION AND VENUE ..... 3
III. THE PARTIES ..... 4
A. Plaintiffs ..... 4
B. Defendants ..... 8
IV. FACTUAL ALLEGATIONS ..... 10
A. The Defect ..... 10
B. The Defect Results in a Serious Risk of Spontaneous Fires ..... 11
A. Pre-Sale Durability Testing ..... 24
V. CLASS ALLEGATIONS ..... 25
VI. TOLLING OF STATUTES OF LIMITATIONS ..... 29
VII. CALIFORNIA LAW APPLIES TO THE CLAIMS OF THE NATIONWIDE CLASS ..... 30
VIII. CLAIMS ALLEGED ..... 31
FIRST CAUSE OF ACTION VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT ("CLRA") (CAL. CIV. CODE § 1750, *ET SEQ.*) ..... 31
SECOND CAUSE OF ACTION VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200) ..... 33
THIRD CAUSE OF ACTION VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW (CAL. BUS. & PROF. CODE § 17500, *ET SEQ.*) ..... 35
FOURTH CAUSE OF ACTION VIOLATION OF THE SONG-BEVERLY ACT – BREACH OF IMPLIED WARRANTY (CAL. CIV. CODE §§ 1792, 1791.1, *ET SEQ.*) ..... 36
JURY DEMAND ..... 38

Plaintiffs, based on the investigation of counsel and experts, file this lawsuit individually and on behalf of a class. Plaintiffs allege as follows:

## I. INTRODUCTION

1. The most important duty of a car manufacturer is to provide consumers with a safe car. A second related duty is to warn consumers and fix a car where a defect that implicates serious safety issues becomes known to the manufacturer.

2. Hyundai and Kia have breached these fundamental duties. Certain Hyundai and Kia vehicles equipped with gasoline direct injection ("GDI") engines (Class Vehicles)[1] contain an engine defect that presents consumers with an unacceptable risk of their vehicles spontaneously bursting into flames.

3. There have been more than 350 consumer complaints regarding Class Vehicles submitted to NHTSA indicating these vehicles caught fire in non-collision circumstances. Plaintiffs Arron Miller and Traci Moore's vehicles were consumed by non-collision fires as a direct result of the defect concealed by Hyundai and Kia.

4. Congress was alerted to the safety issues in the Class Vehicles and requested that the CEOs of Kia and Hyundai appear to answer questions as to why the Class Vehicles spontaneously burst into flames. Even the CEOs of tobacco companies, opioid manufacturers, and gun manufacturing companies appeared when summoned by Congress. Not so here. Hyundai and Kia's CEOs refused to appear.

5. Hyundai and Kia knew prior to sale of the Class Vehicles that their engines were defective, prone to premature and catastrophic failure, and posed an unreasonable risk of non-collision fires all due to inadequate lubrication. Specifically, a design and/or manufacturing defect exists in the Class Vehicles that restricts or

---

[1] On information and belief, the Class Vehicles include, but are not limited to: 2011-2019 Hyundai Sonata; 2013-2019 Hyundai Santa Fe and Santa Fe Sport; 2011-2019 Kia Optima; 2012-2019 Kia Sorento; 2012-2019 Kia Soul; 2011-2019 Kia Sportage. Plaintiffs reserve the right to supplement or amend the Class Vehicles after conducting discovery.

blocks oil flow to the engine's moving parts, such as connecting rod bearings, prematurely wearing out those parts to the point that the engine parts seize, which stops engine operation while running (the "Engine Defect"). Engine seizure often causes internal parts, such as the connecting rods, to break and knock a hole in the engine, permitting fluids to leak and ignite a fire.

6. As a result of this Defect, the putative class members are exposed to an unreasonable and increased risk of accident, injury, or death should their vehicle's engine fail while in operation, let alone if it spontaneously ignites. The Engine Defect also exposes passengers and other drivers on the road to an unreasonable and increased risk of accident, injury, or death. Many putative class members, including Plaintiffs Arron Miller and Traci Moore, have already experienced catastrophic engine failure and fire as a result of the Engine Defect.

7. The catastrophic engine failure and fire risk is the direct result of a defect known to, concealed by, and still unremedied by Hyundai and Kia. Not only did Hyundai and Kia actively conceal the Engine Defect from consumers, but they also did not reveal that the Defect poses a serious safety hazard.

8. Hyundai and Kia knew or should have known about the Engine Defect from: (1) putative class member complaints about this issue made directly to Hyundai and Kia; (2) technical service bulletins and safety recalls issued by Hyundai and Kia for the purpose of attempting to address this Defect; (3) widespread complaints on the internet and lodged with the National Highway Transportation Safety Administration (NHTSA); and (4) Hyundai and Kia's own pre-sale durability testing of the Class Vehicles.

9. Despite Hyundai and Kia's knowledge of the Engine Defect, the automakers have refused to initiate a widespread recall, develop or institute a sufficient fix for the Engine Defect, or answer to Congress and the American consumers about this Defect.

10. As a result of Hyundai and Kia's unfair, misleading, deceptive, and/or fraudulent business practices, in failing to disclose the Engine Defect to Plaintiffs and putative class members, owners and lessees of the Class Vehicles have suffered losses in money and/or property. Had Plaintiffs and the putative class members known of the Engine Defect, they would not have purchased or leased those vehicles, or would have paid substantially less for them. Engine failure and/or fire in the Class Vehicles also requires expensive repairs, car rentals, car payments, towing charges, time off work, and other miscellaneous costs. Moreover, because of the Engine Defect and Hyundai and Kia's concealment, the Class Vehicles have a lower market value, and are inherently worth less than they would be.

11. Plaintiffs bring this action to redress Hyundai and Kia's misconduct. Plaintiffs seek recovery of damages and/or a repair under state consumer protection statutes, breach of implied warranty, and reimbursement of all expenses associated with the repair or replacement of the class vehicle.

## II. JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§1332(d)(2) and (6) because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

13. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants transact substantial business in this district and are headquartered in this District. Defendants have advertised in this district and have received substantial revenue and profits from sales and/or leases of the Class Vehicles in this

district; and have a manufacturing plant here, therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

14. This Court has personal jurisdiction over the Defendants by virtue of them transacting and doing business in this judicial district and because Defendants are headquartered in California. Defendants have transacted and done business in the State of California and in this judicial district and have engaged in statutory violations in California and this judicial district.

## III. THE PARTIES

### A. Plaintiffs

15. Plaintiff and proposed class representative Leslie Flaherty is a resident and citizen of San Jose, California. In October 2013, Ms. Flaherty purchased a new 2013 Kia Soul with a GDI engine from Capitol Kia in San Jose, California. The vehicle came with the manufacturer's 10-year/100,000-mile warranty. The safety and reliability of the vehicle, along with its fuel economy, were important factors to Ms. Flaherty in purchasing it. To date, Ms. Flaherty has not received any recall notices for her vehicle. Ms. Flaherty would not have purchased the vehicle, or she would have paid less for it, had she known about the Engine Defect.

16. Plaintiff and proposed class representative Robert Fockler is a resident and citizen of Cranberry Township, Pennsylvania. In February 2015, Mr. Fockler purchased a certified used 2013 Kia Sorento with a GDI engine from #1 Cochran Kia in Robinson Township, Pennsylvania. The vehicle came with a 10-year/100,000-mile powertrain warranty, and he also purchased an extended warranty provided by Easy Care. Mr. Fockler chose this vehicle because, after researching the car, he saw that it had a high NHTSA crash rating, and because he believed the vehicle was mechanically sound and reliable given the 10-year/100,000-mile warranty. In September 2017, his vehicle's engine was tested, but not replaced, under Recall No.

17V224000 at Baierl Kia. Mr. Fockler would not have purchased the vehicle, or he would have paid less for it, had he known about the Engine Defect.

17. Plaintiff and proposed class representative Donald House is a resident and citizen of Pleasant Garden, North Carolina. In September 2012, Mr. House purchased a new 2013 Kia Optima with a GDI engine from Battleground Kia in Greensboro, North Carolina. The vehicle came with the manufacturer's 10-year/100,000-mile warranty. Mr. House previously owned a 2006 Optima and he purchased the 2013 Optima because of Kia's warranty and reputation for producing reliable vehicles. In January 2018, his vehicle's engine was tested, but not replaced, under Recall No. 17V224000. In November 2018, Mr. House received a "Product Improvement Campaign" notice from Kia requesting that he bring his vehicle in for installation of software that purports to detect engine problems. Mr. House is 70-years-old and when he purchased his vehicle he intended it to be the last new vehicle needed in his lifetime. He was frustrated to learn that his engine is defective and unsafe, among the vehicle's other defects for which he has recently received recall notices. Mr. House would not have purchased the vehicle, or he would have paid less for it, had he known about the Engine Defect.

18. Plaintiff and proposed class representative Dave Loomis is a resident and citizen of Gibsonton, Florida. In August 2018, Mr. Loomis purchased a used 2013 Hyundai Sonata with a GDI engine from Drivetime in Brandon, Florida. The vehicle came with a 5-year/50,000-mile warranty. Mr. Loomis chose this vehicle for its fuel economy and because he believed the Hyundai brand had a good reputation for reliable vehicles. To date, he has not received any recall notices for his vehicle. Mr. Loomis would not have purchased the vehicle, or he would have paid less for it, had he known about the Engine Defect.

19. Plaintiff and proposed class representative Arron Miller is a resident and citizen of Springfield, Georgia. In July 2017, Mr. Miller purchased a used 2011

Hyundai Sonata with a GDI engine from O.C. Welch Ford Lincoln in Hardeeville, South Carolina. He purchased the car for his teenage daughter's use. He considered the vehicle's safety rating in choosing this vehicle, and Mr. Miller ultimately chose the Sonata over other vehicles because of safety concerns. On information and belief, his vehicle's engine was tested, but not replaced, under Recall No. 15V568000 some time before Mr. Miller purchased it. On November 18, 2018, the vehicle's engine erupted in fire while Mr. Miller's daughter was driving it on the highway in Bloomingdale, Georgia. His daughter pulled over to the side of the road and evacuated the vehicle without physical injury. Later inspection of the vehicle's engine confirmed that the vehicle's connecting rod bearing failed, resulting in the connecting rod breaking and punching a hole in the engine, and ultimately causing the fire. Mr. Miller would not have purchased the vehicle, or he would have paid less for it, had he known about the Engine Defect.

20. Plaintiff and proposed class representative Traci Moore is a resident and citizen of Springfield, Illinois. In January 2016, Ms. Moore purchased a certified used 2015 Hyundai Santa Fe with a GDI engine from Green Hyundai in Springfield, Illinois. The vehicle came with a 5-year/60,000-mile warranty and also an extended warranty. In July 2017, the vehicle's engine erupted in fire while Ms. Moore's boyfriend was driving it on the highway. Her boyfriend pulled over to the side of the road, evacuated the vehicle without physical injury, and a passerby assisted in extinguishing the fire. Ms. Moore would not have purchased the vehicle, or she would have paid less for it, had she known about the Engine Defect.

21. Plaintiff and proposed class representative Mark Rice is a resident and citizen of Woodstock, Alabama. In March 2015, Mr. Rice purchased a certified used 2014 Hyundai Sonata with a GDI engine from Tameron Hyundai in Birmingham, Alabama. The vehicle came with a 10-year/100,000-mile warranty. Mr. Rice chose this vehicle because he believed Hyundai was a safe and reliable brand. When he was

buying the car, the dealership representative told him the Sonata was a safer choice than the Elantra because of its size. They also discussed the fact that the Rices would be transporting their child in the car and that it would need to accommodate a car seat. In December 2017, after receiving a letter regarding Recall No. 17V226000, Mr. Rice brought the vehicle to Tameron Hyundai where the engine was tested but not replaced. In or around March or April 2018, the vehicle's engine began making knocking sounds on several occasions while Mr. Rice's wife was driving with their children. In May 2018, Mr. Rice brought it into the dealership where it was diagnosed as a problem with the block portion of the engine. After much haggling, Hyundai replaced the engine. Mr. Rice would not have purchased the vehicle, or he would have paid less for it, had he known about the Engine Defect.

22. Plaintiff and proposed class representative James Smith is a resident and citizen of Pittsburgh, Pennsylvania. In or around August or September 2015, Mr. Smith purchased a used 2013 Hyundai Sonata with a GDI engine from Monroeville Kia in Monroeville, Pennsylvania. The vehicle came with a 5-year/60,000-mile warranty. He chose this vehicle for its size and utility, fuel economy, and because the dealership touted its reliability when he purchased it. He also believed the car was reliable because Hyundai offered a longer warranty. In December 2017, his vehicle's engine was tested, but not replaced, under Recall No. 17V226000. In August 2018, while driving family members in the car in Monroeville, Pennsylvania, Mr. Smith heard a bearing knock in his engine. As a former mechanic he recognized the noise and the danger, so he stopped the car and had it towed to #1 Cochran Hyundai of Monroeville, PA that same day. The dealership had his vehicle for about a month and replaced the short block. Mr. Smith would not have purchased the vehicle, or he would have paid less for it, had he known about the Engine Defect.

**B. <u>Defendants</u>**

23. Defendant Hyundai Motor Company ("HMC") is a South Korean multinational automaker headquartered in Seoul, South Korea. HMC, together with Defendants Kia Motors Corporation, Kia Motors America, Inc., and Hyundai Motor America, comprise the Hyundai Motor Group, which manufactures the GDI engines at issue in this Complaint. HMC is the parent corporation of Hyundai Motor America.

24. Defendant Hyundai Motor America ("HMA") is an automobile design, manufacturing, distribution, and/or service corporation doing business within the United States. HMA designs, develops, manufactures, distributes, markets, sells, leases, warrants, services, and repairs passenger vehicles, including the Hyundai Class Vehicles.

25. Defendant HMA is incorporated and headquartered in the state of California with its principal place of business at 10550 Talbert Avenue, Fountain Valley, California 92708. HMA is the American sales, marketing, and distribution arm of its parent company, HMC, overseeing sales and other operations across the United States. HMA distributes and sells a complete line of Hyundai vehicles through more than 800 dealers throughout the United States. Money received from the purchase or lease of a Hyundai vehicle from a dealership flows from the dealer to HMA and HMC (together, "Hyundai").

26. On information and belief, Defendant HMA is responsible for the distribution, service, repair, installation, and decisions regarding the GDI engines as they relate to the Engine Defect in the Hyundai Class Vehicles.

27. On information and belief, Defendant HMA developed the post-purchase owner's manuals, warranty booklets, and other information related to maintenance recommendations and/or schedules for the Hyundai Class Vehicles.

28. HMA engages in continuous and substantial business in California.

29. Defendant Kia Motors Corporation ("KMC") is a South Korean multinational automaker headquartered in Seoul, South Korea. KMC is the parent corporation of Kia Motors America, Inc. As of December 31, 2017, Defendant KMC's largest shareholder is HMC, which holds 33.88 percent of KMC's stock.[2]

30. Defendant Kia Motors America, Inc. ("KMA") is an automobile design, manufacturing, distribution, and/or service corporation doing business within the United States. KMA designs, develops, manufactures, distributes, markets, sells, leases, warrants, services, and repairs passenger vehicles, including the Kia Class Vehicles.

31. Defendant KMA is incorporated and headquartered in the state of California with its principal place of business at 111 Peters Canyon Road, Irvine, California 92606. KMA is the American sales, marketing, and distribution arm of its parent company, KMC, overseeing sales and other operations across the United States. KMA distributes and sells a complete line of Kia vehicles through more than 755 dealers throughout the United States. Money received from the purchase or lease of a Kia vehicle from a dealership flows from the dealer to KMA and KMC (together, "Kia").

32. On information and belief, Defendant KMA is responsible for the distribution, service, repair, installation, and decisions regarding the GDI engines as they relate to the Engine Defect in the Kia Class Vehicles.

33. On information and belief, Defendant KMA developed the post-purchase owner's manuals, warranty booklets, and other information related to maintenance recommendations and/or schedules for the Kia Class Vehicles.

34. KMA engages in continuous and substantial business in California.

---

[2] 2017 Kia Annual Report, available at http://www.kia.com/worldwide/about_kia/investor_relations/annual_report.do (last visited Dec. 10, 2018).

35. On information and belief, the design, manufacture, modification, installation, and decisions regarding the GDI engines for the Class Vehicles were made exclusively by Defendants.

## IV. FACTUAL ALLEGATIONS

### A. The Engine Defect

36. In 2009, Defendants announced their first line of Gasoline Direct Injection ("GDI") engines in the United States, the "Theta II" engines.[3] The Theta II engines eventually included a turbocharged 2.0-liter model and a naturally aspirated 2.4-liter model.[4] On information and belief, Hyundai used Theta II GDI engines in certain Sonata and Santa Fe vehicles, and Kia used these engines in certain Optima, Sorento, and Sportage vehicles.

37. In 2010, Defendants debuted another, smaller GDI engine, the "Gamma" 1.6-liter engine.[5] On information and belief, Hyundai began using the Gamma GDI engine in certain Accent vehicles.

38. In or around 2013, Defendants introduced another GDI engine to its lineup, the "Nu" 2.0-liter model.[6] Although first introduced in a 1.8-liter size in 2010, the Nu GDI engine line was expanded in 2012 to include this 2.0-liter version. On information and belief, Kia began using the Nu 2.0-liter GDI engines in certain Soul vehicles, while Hyundai used these engines in certain Tucson, Elantra, and Sonata Hybrid vehicles.

39. In 2012, Defendants also added GDI engines to their "Lambda II" engine lineup with 3.0-liter, 3.3-liter, and turbocharged 3.3-liter GDI models. On information

---

[3] https://www.caranddriver.com/news/a18737484/hyundai-unveils-new-2-4-liter-direct-injection-four-cylinder/ (last visited Dec. 12, 2018).

[4] https://www.hyundainews.com/en-us/releases/2291 (last visited Dec. 13, 2018).

[5] *Id.*

[6] https://www.hyundainews.com/en-us/releases/1726 (last visited Dec. 12, 2018).

and belief, Hyundai used the Lambda II GDI engines in certain Genesis, Azera, and Santa Fe vehicles.

40. On information and belief, the Class Vehicles are equipped with various GDI engines that contain the Engine Defect. The Engine Defect restricts oil flow to vital engine parts, including but not limited to the connecting rod and connecting rod bearings. Without proper oil lubrication these engine parts will prematurely wear and eventually fail. This means the worn engine parts will seize and/or break, immediately ceasing engine operation and often knocking a hole in the engine block. Engine fluids then leak through the hole and ignite, causing a sudden engine fire. Along with creating a severe driving hazard and increasing the chance of injury or death, the end result of the Engine Defect is serious, extensive, and expensive damage to the engine and/or total loss of the Class Vehicle.

**B. The Engine Defect results in a serious risk of spontaneous fires.**

41. Complaints submitted to NHTSA via Vehicle Owner Questionnaire ("VOQ") reveal a frighteningly large number of Defendants' vehicles catching on fire. Based on undersigned counsel's search of NHTSA's VOQ database, more than 350 drivers have reported fires in the Class Vehicles.

42. According to the Center for Auto Safety's review of non-collision vehicle fire data, in NHTSA's VOQ database alone, at least 120 owners have reported that their 2011-2014 Optima, Sorento, Sonata, or Santa Fe caught fire without a preceding collision.[7] There are also 229 separate complaints regarding melted wires in the engine bay, smoke, and burning odors, indicating potential fires.[8] The vast majority of

---

[7] *See* 2011-14 Hyundai Kia Fire Complaints excel spreadsheet containing NHTSA complaint data, available at http://www.autosafety.org/wp-content/uploads/2018/06/2011-14-Hyundai-Kia-Fire-Complaints-FINAL.xlsx (last visited Dec. 13, 2018).

[8] *Id.*

complaints that discuss the origins of the vehicle fires state that smoke and/or flames are first seen emanating from the engine bay, and then the car is quickly engulfed.

43. Based on the high volume of non-collision vehicle fires, on June 11, 2018, the Center for Auto Safety petitioned NHTSA to investigate a fire-causing defect in 2011-2014 Kia Optima and Sorento, and Hyundai Sonata and Santa Fe vehicles.[9] On July 24, 2018, the Center filed an addendum to its original petition, requesting NHTSA expand the investigation to include 2010-2015 Kia Soul vehicles.[10]

44. In October 2018, as reports of these fires continued to increase, the Center for Auto Safety publically called on Defendants to recall these vehicles, saying, "Since our call for an investigation into these Kia and Hyundai non-collision fires, we have seen reports of ***almost one fire every single day across these five models***."[11] The statement went on to say, "The number and severity of these complaints, when people are simply driving their cars on the highway, is frightening. It is long past time for Kia and Hyundai to act. Car fires put everyone on the road in significant danger."

45. The Center for Auto Safety reported that between June 12 and October 12, 2018, it learned of 103 additional fire reports, amounting to an 85% increase.

46. While automakers occasionally produce vehicles that catch fire, when compared to these Hyundai and Kia vehicles, the Center for Auto Safety noted that there is enough of a statistical disparity to suggest a systemic issue. More specifically,

---

[9] *See* June 11, 2018 Center for Auto Safety Petition, available at https://www.autosafety.org/wp-content/uploads/2018/06/Center-for-Auto-Safety-Kia-Hyundai-Fire-Defect-Petition.pdf (last visited Dec. 13, 2018).

[10] *See* July 24, 2018 Center for Auto Safety Petition, available at https://www.autosafety.org/wp-content/uploads/2018/06/Center-for-Auto-Safety-Addendum-to-June-11-2018-petition-regarding-Kia-Hyundai-fires.pdf (last visited Dec. 13, 2018).

[11] October 12, 2018 Center for Auto Safety Press Release, available at https://www.autosafety.org/center-for-auto-safety-demands-recall-of-2-9-million-2011-2014-kia-and-hyundai-vehicles-after-almost-one-non-collision-fire-report-every-day-for-four-months/ (last visited Dec. 13, 2018).

in its June 7, 2018 review of all NHTSA-reported cases of non-collision fires involving similar class and size vehicles, the Center found there were 22 reported cases in competitor vehicles as opposed to 120 for the Kia and Hyundai models.[12] The June 11, 2018 Petition noted that Defendants' competitors Honda and Toyota sold 3.4 million comparable vehicles in the U.S. to Defendants' approximately 2.2 million vehicles, and that "[w]hen factoring in the number of vehicles of these types sold per manufacturer compared to the number of fire complaints, the differences are even more profound."[13]

47. Summarizing its findings on these five Hyundai/Kia vehicle models (all of which are Class Vehicles), the Center for Auto Safety found that as of July 23, 2018, NHTSA's VOQ database contained reports of at least:

- 39 non-collision 2011-2014 Kia Sorento fires
- 36 non-collision 2011-2014 Kia Optima fires
- 23 non-collision 2010-2015 Kia Soul Fires
- 51 non-collision 2011-2014 Hyundai Sonata fires
- 12 non-collision 2011-14 Hyundai Santa Fe fires
- **161 non-collision fires total**

48. Some typical examples of NHTSA non-collision fire complaints include:

**2014 Kia Santa Fe – NHTSA ID No. 11113354**

WHILE RETURNING FROM VACATION ON JULY 17, 2018, TRAVELING ON THE NEW JERSEY TURNPIKE FROM BOSTON, MA TO ARNOLD, MD, AFTER APPROXIMATELY TRAVELING FOR 4 HOURS, WITH A STOP 1 HOUR PRIOR TO A REST AREA, WE TOOK EXIT 7A TO PROCEED ONTO I-295 AND THE CAR SUDDENLY LOST ALL POWER. PULLED OVER TO THE SIDE, OPENED HOOD, SMOKE AND FLAMES

---

[12] *See* June 11, 2018 Center for Auto Safety Petition, available at https://www.autosafety.org/wp-content/uploads/2018/06/Center-for-Auto-Safety-Kia-Hyundai-Fire-Defect-Petition.pdf (last visited Dec. 13, 2018).

[13] *Id.*

COMING FROM THE ENGINE WITH NO WARNING. VEHICLE BURNED AND EXPLODED PRIOR TO THE FIRE DEPARTMENT ARRIVING. VEHICLE IS TOTALLY GONE AND THERE IS A METAL SHELL, THE ENTIRE CAR WAS IN FLAMES AND BURNED UP. THIS HAPPENED VERY QUICKLY WITH NO WARNING. CAR HAD APPROXIMATELY 61,000 MILES, EXTENDED WARRANTY, AND ALL REQUIRED MAINTENANCE HAD BEEN PERFORM BY THE LOCAL HYUNDAI DEALER IN ANNAPOLIS, MD.

**2013 Hyundai Sonata – NHTSA ID No. 11115600**

I WAS DRIVING MY VEHICLE ON THE 95 N GOING ONTO 295 N HIGHWAY FOR APPROXIMATELY 1 HOUR WHEN IT STARTED TO LOSE POWER AND SMOKE. I PULLED OVER AND DISCOVERED VIA ANOTHER CAR PASSING BY THAT THE VEHICLE WAS ON FIRE AND IT WENT UP IN FLAMES.

**2013 Kia Optima - NHTSA ID No. 11112989**

TL* THE CONTACT OWNED A 2013 KIA OPTIMA. WHILE DRIVING 60 MPH, SMOKE APPEARED UNDER THE VEHICLE ON THE DRIVER¿S SIDE. THE CONTACT WAS ALERTED OF FLAMES BY OTHER MOTORISTS. THE CONTACT PULLED THE VEHICLE OVER TO THE SIDE OF THE ROAD AND EXITED ON THE PASSENGER SIDE. THERE WERE NO INJURIES SUSTAINED. THE FIRE DEPARTMENT EXTINGUISHED THE FIRE AND A POLICE REPORT WAS FILED. THE VEHICLE WAS TOWED AND DEEMED A TOTAL LOSS. THE CONTACT CALLED EARNHARDT KIA DEALER AT (602) 346-5400 (LOCATED AT 2121 E BELL RD, PHOENIX, AZ 85022), BUT THE VEHICLE WAS NOT DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE VIN WAS NOT AVAILABLE. THE FAILURE MILEAGE WAS 30,000.

**2012 Kia Sorento - NHTSA ID No. 11111708**

JUNE 23 DRIVING ON THE FREEWAY POPPING NOISECOMING FROM WHAT SOUNDED LIKE UNDER THE CAR RED ENGINE SYMBOL COMES ON IN THE LOWER LEFT HAND CORNER OF DASH IMMEDIATELY BEGIN GETTING OVER SECOND POPPING OCCURS WITHIN 10-15 SECONDS RED OIL LAMP LIGHT COMES ON RIGHT HAND SIDE OF DASHBOARD SMOKING FROM VEHICLE HAPPENS IMMEDIATELY GET TO SIDE OF FREEWAY ATTEMPT TO TURN OFF CAR RESTARTS ATTEMPT AGAIN TURNS OFF IMMEDIATELY GET OUT OF CAR AND RUN TOWARDS GOOD SAMARITAN WHO WITNESSES ENTIRE THING STOPS AND STAYS WITH ME ENTIRE TIME 911 CALLED ANOTHER VEHICLE PULLS OVER AS FRONT OF VEHICLE IS FULLY ENGULFED IN FLAMES AND ATTEMPTS TO EXTINGUISH FIRE BUT TO NO AVAIL FIRE TRUCKS AND FREEWAY ROADSIDE ASSISTANCE COME WITHIN 10 MINUTES OF INCIDENT EXTINGUISH FRONT OF MY VEHICLE VEHICLE TOWED IN MOTION AT BEGINNING ON FREEWAY PULLED OVER AND GOT OUT ON SIDE OF FREEWAY NHTSA RECALL NUMBER17V224 MAY AND OCTOBER 2017 JUST HAD 105,000 MILE MAINTENANCE DONE AT RALLY KIA ON JUNE 11

**2014 Kia Soul – NHTSA ID No. 11120580**

ON AUGUST 16, 2018 AT APPROX 1030 PM MY DAUGHTER WAS DRIVING ON ROUTE 5 IN HOLLIS CETNER MAINE AT APPROX 50 MPH AND CAR STARTED RUNNING ROUGH, SMOKE STARTED COMING FROM UNDER HOOD. PULLED OVER TO THE SIDE OF ROAD AND CAR WAS ON FIRE UNDERNEATH ENGINE, MELTING THE ENGINE. FOUND MELTED ENGINE PARTS (PISTON HEADS, CONNECTING RODS) ON THE GROUND ALONG WITH OTHER MELTED PARTS. FIRE WAS PUT OUT BY HOME OWNER ON ROUTE 5

49. On information and belief, Defendants were aware of the alarming failure rate of the Class Vehicles’ engines because of the Engine Defect, through but not

limited to: (1) Defendants' own records of customer complaints; (2) dealership repair records; and (3) NHTSA complaints.

50. In November 2018, Hyundai and Kia denied U.S. Senator Bill Nelson's request that the companies' CEOs testify a hearing regarding these rampant reports of engine fires involving Defendants' vehicles. In refusing, Kia defensively responded by asking the Senate to look at non-collision vehicle fires in among ***all*** automakers, saying, "To gain a full understanding of this industrywide matter, we have respectfully requested the committee consider a more comprehensive review of non-collision fires among all automakers."[14]

51. As the Center for Auto Safety aptly lamented just last month: "Until Hyundai and Kia are willing to take responsibility for the 3 million vehicles on the road that could burst into flames at any minute—with no apparent warning to the driver—we will continue to press for a recall and full and thorough investigation. There has already been one death and a few injuries associated with these vehicle fires. How many people need to be horrifically burned before someone takes action?"[15]

**C. Defendants issue inadequate and incomplete recalls.**

52. In June 2015, NHTSA contacted Hyundai regarding instances of stalling events in 2011-2012 Hyundai Sonatas. "Hyundai explained that, as of that time, it did not consider the issue to be safety-related…"[16] NHTSA's Office of Defects

---

[14] https://www.wesh.com/article/new-info-uncovered-as-kia-hyundai-ceos-refuse-to-testify-before-senate-committee/25104440 (last visited Dec. 13, 2018).

[15] Nov. 8, 2018 statement from Jason Levine, Executive Director of the Center for Auto Safety, regarding Hyundai and Kia's refusal to testify before the U.S. Senate, available at https://www.autosafety.org/statement-from-jason-levine-executive-director-on-the-apparent-refusal-by-hyundai-and-kia-to-testify-at-us-senate-hearing/ (last visited Dec. 12, 2018).

[16] Part 573 Safety Recall Report Chronology for NHTSA Recall No. 15V568000, Sept. 10, 2015, available at https://static.nhtsa.gov/odi/rcl/2015/RCLRPT-15V568-9490.PDF (last visited Dec. 13, 2018), at 2.

Investigation responded by, as Hyundai put it, "inform[ing] Hyundai of its concern over the potential for higher speed stalling events."

53. As a result of NHTSA's prodding, in September 2015, Hyundai issued Recall No. 15V568000 for 470,000 MY 2011-2012 Hyundai Sonata vehicles equipped with 2.4L and 2.0L turbo GDI engines for a defect described as "connecting rod wear" that "may result in engine stall."

54. In its NHTSA filings, Hyundai described the Recall No. 15V568000 defect and manifestation as follows:

> Hyundai has determined that metal debris may have been generated from factory machining operations as part of the manufacturing of the engine crankshaft during the subject production period. As part of the machining processes, the engine crankshaft is cleaned to remove metallic debris. If the debris is not completely removed from the crankshaft's oil passages, it can be forced into the connecting rod oiling passages restricting oil flow to the bearings. Since bearings are cooled by oil flow between the bearing and journal, a reduction in the flow of oil may raise bearing temperatures increasing the potential of premature bearing wear. A worn connecting rod bearing will produce a metallic, cyclic knocking noise from the engine which increases in frequency as the engine rpm increases. A worn connecting rod bearing may also result in illumination of the oil pressure lamp in the instrument cluster. If the vehicle continues to be driven with a worn connecting rod bearing, the bearing can fail, and the vehicle could stall while in motion.[17]

55. Subsequently, in December 2015, Hyundai issued a Technical Service Bulletin (TSB) to dealerships about Recall No. 15V568000 and the steps for performing recall procedures. The TSB instructed dealerships to conduct "an Engine Noise Inspection to confirm [the engine's] normal operation" and that the sound test would "help indicate if the engine is operating normally or if an excessive connecting rod bearing wear condition in the engine crankcase may be present." The TSB went on to describe the consequences if the defect manifested, stating, "If the vehicle continues

[17] *Id.* at 1.

to be driven with a worn connecting rod bearing, the bearing can fail, and the vehicle could stall while in motion, increasing the risk of a crash."[18]

56. Tellingly, Hyundai breezed over the inherent risk of vehicle fires associated with the defect in both its descriptions to vehicle owners/lessees and dealers, settling on the more benign outcome, a stall, over the deadly ones, catastrophic engine failure and/or fire.[19]

57. Hyundai's December 2015 TSB in Recall No. 15V568000 only called for engine replacement if the vehicle did not pass the sound test. If the engine did pass, no actual repair was made to the vehicle, its engine, or any other parts. Hyundai simply instructed the dealers to swap out the vehicle's dipstick and top off the oil. This left "passing" vehicles and their owners vulnerable to future development and manifestation of the Engine Defect and its dire consequences.

58. In fact, that is precisely what happened to Plaintiff Arron Miller. On information and belief, a Hyundai dealership examined his vehicle under Recall No. 15V568000 sometime before he purchased it, the vehicle passed the sound test, and the engine was not replaced. This inaction meant Mr. Miller's teenage daughter was driving the car when the engine suddenly failed and then went up in flames. She narrowly escaped the event unharmed.

59. In March 2017, Hyundai issued Recall No. 17V226000 for 572,000 MY 2013-2014 Hyundai Sonata and Santa Fe Sport vehicles equipped with 2.0L and 2.4L

---

[18] Dec. 2015 Remedy Instructions and TSB, available at https://static.nhtsa.gov/odi/rcl/2015/RCRIT-15V568-3933.pdf (last visited Dec. 13, 2018), at 1.

[19] *See, e.g.*, "Recall 17V226000[:] Engine Wears and Seizes," RepairPal.com, Mar. 31, 2017, available at https://repairpal.com/recall/17V226000 (last visited Dec. 12, 2018) (noting that, despite the defect consequences being limited to "engine seizing [that] would possibly strand occupants or cause an accident," the reality is that the bearings inside the engine "could wear prematurely due to machining issues during manufacturing[, and i]f the engine seizes as a result, a fire could occur, and the engine would lose vehicle propulsion").

GDI engines for a defect described as "bearing wear" that "may result in engine seizure."

60. In its NHTSA filings, Hyundai described the Recall No. 17V226000 defect and manifestation as follows:

> The subject engines may contain residual debris from factory machining operations, potentially restricting oil flow to the main bearings and leading to premature bearing wear. A worn connecting rod bearing will produce a cyclic knocking noise from the engine and may also result in the illumination of the oil pressure lamp in the instrument panel. Over time, the bearing may fail and the vehicle could lose motive power while in motion.[20]

61. In June 2017, Hyundai issued a TSB and Dealer Best Practice Guide to dealers addressing the issue in the 2013-2014 Sonata and Santa Fe vehicles. The documents describe a defect identical to that in the earlier Sonata model years and orders the same purported "fix":

> The engines in certain 2013-2014 model year Sonata (YF) and Santa Fe Sport (AN) vehicles equipped with 2.4L and 2.0T GDI engines may contain residual debris from factory machining operations, potentially restricting oil flow to the main bearings and leading to premature bearing wear. Over time, a bearing may fail and the vehicle could lose power while in motion.
>
> Indications of a worn connecting rod bearing include:
>
> 1. Knocking noise from the engine
> 2. Reduced power and/or hesitation
> 3. Illumination of the "Check Engine" warning lamp
> 4. Illumination of engine oil pressure warning lamp

---

[20] Part 573 Safety Recall Report for NHTSA Recall No. 17V226000, Mar. 31, 2017, available at https://static.nhtsa.gov/odi/rcl/2017/RCLRPT-17V226-4558.pdf (last visited Dec. 13, 2018), at 1.

> The service process consists of an inspection and dipstick, oil and oil filter replacement. If the vehicle does not pass the inspection, the dealer will replace the engine.[21]

62. Much like Hyundai's earlier 2011-2012 Sonata recall, in its Part 573 Safety Recall Report for NHTSA Recall No. 17V226000, Hyundai summarily explains that, "Over time, the bearing may fail and the vehicle could lose motive power while in motion."[22] Careful not to even use the word "stall," Hyundai's 2017 disingenuous "recall inspection" of later model year Sonatas for a malfunction mechanically known to be associated with vehicle fires demonstrates Hyundai's continued concealment of the Engine Defect and its consequences to this day.

63. Notably, in its chronology submission for the recall associated with subsequent model year Sonatas (NHTSA Recall No. 17V226000), Hyundai conceded that its recall was the result of Hyundai "continu[ing] to monitor engine-related field data" from the original 15V568000 recall group and "noting an increase in claims relating to the subsequent model years."[23]

64. Again attempting to mitigate the gravity of the Defect, Hyundai noted in its chronology submission to NHTSA that "the majority of claims for engine replacement indicated that customers were responding to substantial noise or the vehicle's check engine or oil pressure warning lights (and bringing their vehicles to service as a result of those warnings)."[24] In other words, Hyundai was relying on

---

[21] June 2017 Dealer Best Practice Guide, available at https://static.nhtsa.gov/odi/rcl/2017/RCMN-17V226-4739.pdf (last visited Dec. 13, 2018), at 3.

[22] Part 573 Safety Recall Report for NHTSA Recall No. 17V226000, Mar. 31, 2017, available at https://static.nhtsa.gov/odi/rcl/2017/RCLRPT-17V226-4558.pdf (last visited Dec. 13, 2018), at 2.

[23] *See id.*

[24] *Id.*

customers to prevent their own catastrophic engine failure that could *at best* result in a moving stall and *at worst* result in a vehicle fire.

65. Those vehicle owners and lessees whose engines were not replaced under the Recall No. 17V226000 process were again the most vulnerable to impending harm. And again, this turned out to be true for several Plaintiffs: Mark Rice and James Smith had their vehicle engines tested under the recall and they passed, only to later fail and require replacement.

66. In March 2017, Kia also issued a recall virtually identical to that of Hyundai: Recall No. 17V224000 for 618,160 MY 2011-2014 Optima, 2012-2014 Sorento, and 2011-2013 Sportage vehicles equipped with 2.0L turbo GDI or 2.4L GDI engines for a defect described as "bearing wear" that "may result in engine seizure."

67. In its NHTSA filings, Kia described the Recall No. 17V224000 defect and manifestation as follows:

> Metal debris may have been generated from factory machining operations as part of the manufacturing of the engine crankshaft which may not have been completely removed from the crankshaft's oil passages during the cleaning process. In addition, the machining processes of the crankpins caused an uneven surface roughness. As a result, the metal debris and uneven surface roughness can restrict oil flow to the bearings, thereby increasing bearing temperatures causing premature bearing wear. A worn connecting rod bearing will produce a cyclic knocking noise from the engine and may also result in the illumination of the engine warning lamp and/or oil pressure lamp in the instrument panel. If the warnings are ignored and the vehicle is continued to be driven, the bearing may fail and the vehicle could stall while in motion.[25]

68. But in Kia's September 2017 TSB to dealers for Recall No. 17V224000, in addition to the metal debris problem, it lists an extra cause for the oil restriction: "the additional machining processes of the crankpins may have caused uneven surface

---

[25] Part 573 Safety Recall Report for NHTSA Recall No. 17V224000, Mar. 31, 2017, available at https://static.nhtsa.gov/odi/rcl/2017/RCLRPT-17V226-4558.pdf (last visited Dec. 13, 2018), at 2.

roughness."[26] The TSB states, "These combined conditions can restrict oil flow to the bearings increasing the potential for premature bearing wear."[27]

69. Kia's recall procedure mirrored that of Hyundai's in its two recalls: perform the sounds test, and if the engine passes, simply change out the color-coded dipstick and change the oil. If the car does not pass, replace the engine.[28]

70. Curiously, in its chronology submitted to NHTSA regarding Recall No. 17V224000, Kia notes that when it learned of the Hyundai 15V568000 recall in September 2015, it "check[ed] Theta engine manufacturing process for Optima on separate assembly line and identifie[d] different procedures and no issues."[29] But the chronology goes on to say that in January to April 2016, the engine remanufacturer Translead conducted a "detailed review of all recent Kia warranty returned engines" and identified "***oil delivery issue*** with Theta GDI engines (Optima, Sportage & Sorento)."[30] (Emphasis added.) As Kia's warranty claims increased through 2016, it extended the warranties on these vehicles, but still waited until March 2017 to issue a formal recall after finally focusing "on anticipatory risk compared to absence of accidents or injuries."[31]

---

[26] Revised Remedy Instructions and TSB for NHTSA Recall No. 17V224000, Sept. 1, 2017, available at https://static.nhtsa.gov/odi/rcl/2017/RCRIT-17V224-4127.pdf (last visited Dec. 13, 2018), at 1.

[27] *Id.*

[28] *See id.*

[29] Chronology addendum to Second Amended Part 573 Safety Recall Report for NHTSA Recall No. 17V226000, Aug. 23, 2017, available at https://static.nhtsa.gov/odi/rcl/2017/RMISC-17V224-3802.pdf (last visited Dec. 13, 2018), at 1.

[30] *Id.*

[31] *Id.* at 2.

71. Throughout all three recalls, Defendants boasted no reports of accidents or injuries associated with the Defect.[32] Even if taken as true, this means Hyundai and Kia would have hundreds of thousands of defective vehicle drivers *wait to be injured or die* as a result of a defect that admittedly results in moving stalls and clearly (though not yet publicly admitted by Hyundai) results in spontaneous vehicle fires.

72. As problematic as these recalls and purported fixes were already, they also left out swaths of vehicles with GDI engines that have been marked by reports of non-collision fires, like the Kia Soul and later model years of the Santa Fe. In fact, Plaintiff Traci Moore's 2015 Santa Fe experienced an engine failure and fire that appears scarily similar to the defect that is the subject of these prior recalls.

73. In October 2018, Kia began sending owners and lessees of 2011-2014 Optima, 2012-2014 Sorento, and 2011-2013 Sportage vehicles letters regarding a "Product Improvement Campaign" in response to widespread reports of non-collision vehicle fires. In November 2018, Plaintiff Donald House received one such letter, which explained the "Product Improvement Campaign" as follows:

> Kia Motors America, Inc. is conducting an important Product Improvement Campaign to perform a software update on all 2011-2013 MY Optima vehicles equipped with 2.4L Gasoline Direct Injection ("GDI") and 2.0L Turbocharged GDI ("T-GDI") engines, and some 2014 MY Optima vehicles equipped with 2.4L GDI and 2.0L T-GDI engines to protect the engine from excessive connecting rod bearing damage. The update will be done free of charge and will only involve the addition of newly developed computer software for the Engine Control Unit ("ECU").
>
> Kia recently developed a Knock Sensor Detection System ("KSDS") that detects vibrations indicating the onset of excessive connecting rod bearing wear in the engine. The KSDS is designed to alert a vehicle driver at an early stage of bearing wear before the occurrence of severe engine damage including engine failure.

---

[32] *See id.*; Part 573 Safety Recall Report for NHTSA Recall No. 17V226000, Mar. 31, 2017, available at https://static.nhtsa.gov/odi/rcl/2017/RCLRPT-17V226-4558.pdf (last visited Dec. 13, 2018).

74. Notably this purported solution does not fix any inherent engine defect, nor does it prevent these vehicles from the Defect manifesting, i.e., premature engine failure, and the resulting need for engine replacement.

**D. Defendants' pre-sale durability testing**

75. Defendants are experienced in the design and manufacture of consumer vehicles. As experienced manufacturers, Defendants conduct tests, including pre-sale durability testing, on incoming components, including the engine, to verify the parts are free from defects and align with Defendants' specifications.

76. Kia conducts expansive presale durability testing on its vehicles to make sure they "endure over a long time without fault."[33] This presale testing includes seven different types of durability tests: (1) an item durability test; (2) a module durability test; (3) a Belgian road test; (4) a high-speed test; (5) a corrosion test; (6) a P/T test; and (7) a vehicle test. Kia conducts these tests "in extreme weather conditions including desert with blazing sunlight and coldness of 40 degrees below zero."

77. Specifically, regarding testing its engines, Kia states that it puts "our engines through rigorous testing in the highest, hottest and coldest places that a car can possibly be before we use them in our cars."

78. In addition, Kia conducts extensive "driving test[s]" in which it puts "our cars to endurance test under diverse harsh conditions that can be encountered on Earth" because "[a]ny fault in your car can affect your safety." Kia expands on six different road tests that it conducts, including a durability test on a road "so rough that driving around 10,000 miles on it gives the same effect of driving around 60,000 on regular roads. Cars that survive the test only can be presented to customers."

[33] http://www.kia.com/worldwide/experience_kia/rnd/performance.do (last visited Dec. 13, 2018).

79. In addition, John Juriga, the Director of Powertrain at Kia in 2015, stated that Kia's validation testing is among the toughest in the automotive industry.[34] Among other things, this validation testing runs the engine at maximum throttle (the maximum speed the engine can operate under) while under full load "so we're stressing the components as much as possible and we run it virtually nonstop for 300 hours." After, Kia does an "overrun spec" where it runs it over spec for 10-20 hours to make sure it can survive past the red line limits in order to "make sure these products stay durable in the customers' hands."

80. Moreover, Kia also uses "the most extreme and rigorous vehicle testing program ever devised by the company."[35] As part of this test, Kia stimulates stop-and-go driving repeated over several times to "put additional strain on the engine, transmission and HVAC systems and eliminate any possible flaws." In addition, at its Mojave Proving Grounds test site, Kia utilizes a "high-speed oval, gravel off-road tracks, high-vibration road surfaces, brake test facilities and different gradients" that "enable engineers to evaluate and refine the ride, handling, brakes and NVH of prototype and production vehicles."

81. On information and belief, Hyundai conducts durability testing on its vehicles that is similar to Kia's testing.

## V. CLASS ALLEGATIONS

82. Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rules 23(a), b(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following classes:

---

[34] https://www.youtube.com/watch?v=GNPB3RtHN2M (last visited Dec. 13, 2018).

[35] https://www.thenewsmarket.com/global/kia-motors-corporation/death-valley-hot-weather-test-for-all-new-kia-sportage/s/bfe8a9b5-9786-4e73-a648-2970972d74f1 (last visited Dec. 13, 2018).

**Nationwide Class**

All persons or entities who purchased or leased a Class Vehicle in the United States.

**California State Class**

All persons or entities who purchased or leased a Class Vehicle in the State of California.

83. Excluded from the Classes are individuals who have personal injury claims resulting from the Defect in the Class Vehicles. Also excluded from the Classes are Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Classes; governmental entities; and the Judge to whom this case is assigned and his/her immediate family. Plaintiffs reserve the right to revise the Class definitions based on information learned through discovery.

84. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

85. This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

86. **Numerosity.** Federal Rule of Civil Procedure 23(a)(1): The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are hundreds of thousands of members of the Class due to widespread sales of Class Vehicles nationwide, the precise number of Class members is unknown to Plaintiffs but may be ascertained from the Defendants' books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice. Plaintiffs believe, and on that basis allege, that hundreds of thousands of Class Vehicles have been sold and/or leased nationwide.

87. **Commonality and Predominance.** Federal Rule of Civil Procedure 23(a)(2) & (b)(3): This action involves common questions of law and fact which predominate over any questions affecting individual Class members, including, without limitation:

a. Whether Defendants engaged in the conduct alleged herein;

b. Whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

c. Whether the Class Vehicles have and were sold with the Defect;

d. Whether a reasonable consumer would consider the Defect or its consequences to be material;

e. Whether the Defect is a safety defect;

f. Whether Defendants knew of the Defect but failed to disclose the problem and its consequences to consumers;

g. When Defendants discovered the Engine Defect, and what, if anything, they did in response;

h. Whether Defendants' conduct violates the California Legal Remedies Act, California Unfair Competition Law, California False Advertising Law, the Song-Beverly Act, and any other statutes asserted herein;

i. Whether Plaintiffs and Class members overpaid for their Class Vehicles;

j. Whether Plaintiffs experienced out-of-pocket losses as a result of the Engine Defect, and if so, how much; and

k. Whether Plaintiffs and Class members are entitled to damages and other monetary relief and, if so, in what amount.

88. **Typicality.** Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the Class members' claims because, among other things, all Class members were comparably injured through the Defendants' wrongful conduct as described herein.

89. **Adequacy.** Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Classes they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

90. **Superiority.** Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for the members of the Classes to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. On information and belief, Class members can be readily identified and notified based on, *inter alia*, Defendants' vehicle identification numbers, warranty claims, registration records, and database of complaints.

91. Defendants have acted, and refused to act, on grounds generally applicable to the Classes, thereby making appropriate final equitable relief with respect to the Classes as a whole.

## VI. TOLLING OF STATUTES OF LIMITATIONS

### A. Discovery Rule Tolling

92. Plaintiffs and Class members had no way of knowing about Defendants' deception with respect to the Engine Defect.

93. Within the time period of any applicable statutes of limitation, Plaintiffs and Class members could not have discovered through the exercise of reasonable diligence that Defendants were concealing the Defect and conduct complained of herein and misrepresenting the companies' true position with respect to the Engine Defect.

94. Plaintiffs and Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Defendants had concealed information about the Engine Defect in the Class Vehicles, which was discovered by Plaintiffs shortly before this action was filed.

95. For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Class Vehicles.

### B. Fraudulent Concealment Tolling

96. All applicable statutes of limitation have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

97. Defendants concealed the Engine Defect, minimized the scope, cause, and dangers of the Defect with inadequate recalls, and refused to investigate, address, and remedy the Defect as it pertains to all Class Vehicles.

**C. Estoppel**

98. Defendants were under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles' suffering from the Engine Defect, and the inevitable repairs, costs, time, and monetary damage resulting from the Engine Defect.

99. Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## VII. CALIFORNIA LAW APPLIES TO THE CLAIMS OF THE NATIONWIDE CLASS

100. California law applies to the nationwide claims because California's interest in this litigation exceeds that of any other state.

101. Defendant HMA is headquartered in Fountain Valley, California and is the sole entity in the United States responsible for distributing, selling, leasing, and warranting Hyundai vehicles, including the Hyundai Class Vehicles.

102. Defendant KMA is headquartered in Irvine, California and is the sole entity in the United States responsible for distributing, selling, leasing, and warranting Kia vehicles, including the Kia Class Vehicles.

103. Defendants each maintain their customer relations, engineering, marketing, and warranty departments at their corporate headquarters in this judicial district. Defendants' customer relations department is responsible for fielding customer complaints and monitoring customer complaints posted to their respective websites or third-party websites.

104. Defendants' warranty and engineering departments are both responsible for the decisions to conceal the Engine Defect from Defendants' respective customers.

105. Based on the foregoing, such policies, practices, acts, and omissions giving rise to this were developed in, and emanated from, Defendants' headquarters in this judicial district in California. As detailed below, Defendants knew or should have known about the Engine Defect through the activities of their divisions and affiliated

entities located within California. Accordingly, the State of California has the most significant relationship to this litigation and its law should govern.

## VIII. CLAIMS ALLEGED

### FIRST CAUSE OF ACTION

### VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT ("CLRA") (CAL. CIV. CODE § 1750, *ET SEQ.*)

**(On Behalf of the Nationwide Class or, Alternatively, the California Class)**

106. Plaintiffs and the Classes incorporate by reference all paragraphs as though fully set forth herein.

107. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class against Defendants. Alternatively, Plaintiff Leslie Flaherty brings this claim on behalf of herself and the California Class against Defendants.

108. Defendants are persons as defined in California Civil Code § 1761(c).

109. Plaintiffs and the Class members are "consumers" as defined in California Civil Code §1761(d).

110. Defendants engaged in unfair and deceptive acts in violation of the CLRA through the practices described herein, and by knowingly and intentionally concealing the Engine Defect in the Class Vehicles from Plaintiffs and Class members, along with concealing the risks, costs, and monetary damage resulting from the Engine Defect. These acts and practices violate, at a minimum, the following sections of the CLRA:

(a)(2) Misrepresenting the source, sponsorship, approval, or certification of goods or services;

(a)(5) Representing that goods or services have sponsorships, characteristics, uses, benefits, or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have;

(a)(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

(a)(9) Advertising goods and services with the intent not to sell them as advertised.

111. Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

112. Defendants knew the Class Vehicles' engines were defectively designed or manufactured, would fail prematurely, were prone to cause fires, and were not suitable for their intended use.

113. Defendants had a duty to Plaintiffs and Class members to disclose the defective nature of the Class Vehicles' engines because:

a. Defendants were in a superior position to know the true state of facts about the Engine Defect and associated repair costs in the Class Vehicles and their engines;

b. Plaintiffs and Class members could not reasonably have been expected to learn or discover that the Class Vehicles and their engines had a dangerous safety defect until manifestation of the Defect; and

c. Defendants knew that Plaintiffs and Class members could not reasonably have been expected to learn or discover the Engine Defect and the associated repair costs until manifestation of the Defect.

114. In failing to disclose the Engine Defect and the associated safety risks and repair costs that result from it, Defendants have knowingly and intentionally concealed material facts and breached their duty to disclose.

115. The facts concealed or not disclosed by Defendants to Plaintiffs and Class members are material in that a reasonable consumer would have considered them

important in deciding whether to purchase Defendants' Class Vehicles or to pay a lesser price. Had Plaintiffs and the Classes known about the defective nature of the Class Vehicles and their engines, they would not have purchased or leased the Class Vehicles or would have paid less for them.

116. On or about December 11, 2018, on behalf of Plaintiff Leslie Flaherty, undersigned counsel provided Defendants notice of their violations of the CLRA under California Civil Code § 1782(a) regarding the Class Vehicles.

117. Plaintiffs and Class members' injuries were proximately caused by Defendants' fraudulent and deceptive business practices.

118. Plaintiffs and the Class members seek all relief available under the CLRA.

## SECOND CAUSE OF ACTION

## VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200)

**(On Behalf of the Nationwide Class or, Alternatively, the California Class)**

119. Plaintiffs and the Classes incorporate by reference all paragraphs as though fully set forth herein.

120. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class against Defendants. Alternatively, Plaintiff Leslie Flaherty brings this claim on behalf of herself and the California Class against Defendants.

121. The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

122. Defendants engaged in unfair competition and unfair, unlawful or fraudulent business practices through the conduct, statements, and omissions described herein, and by knowingly and intentionally concealing the Engine Defect in the Class

Vehicles from Plaintiffs and Class members, along with concealing the risks, costs, and monetary damage resulting from the Engine Defect. Defendants should have disclosed this information because they were in a superior position to know the true facts related to the Engine Defect, and Plaintiffs and Class members could not reasonably be expected to learn or discover the true facts related to the Defect.

123. The Engine Defect causing inadequate engine oil lubrication and resulting in catastrophic engine failure and fire in the Class Vehicles constitutes a safety issue that triggered Defendants' duty to disclose the safety issue to consumers.

124. These acts and practices have deceived Plaintiffs and are likely to deceive the public. In failing to disclose the Defect and suppressing other material facts from Plaintiffs and Class members, Defendants breached their duties to disclose these facts, violated the UCL, and caused injuries to Plaintiffs and Class members. Defendants' omissions and concealment pertained to information that was material to Plaintiffs and Class members, as it would have been to all reasonable consumers.

125. The injuries suffered by Plaintiffs and Class members are not greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiffs and Class members should have reasonably avoided.

126. Defendants' acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750, *et seq.*, and California Commercial Code § 2313.

127. Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitutionary disgorgement of all monies and revenues generated as a result of such practices, and all other relief allowed under California Business & Professions Code § 17200.

## THIRD CAUSE OF ACTION

**VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW (CAL. BUS. & PROF. CODE § 17500, *ET SEQ.*)**

**(On Behalf of the Nationwide Class or, Alternatively, the California Class)**

128. Plaintiffs and the Classes incorporate by reference all paragraphs as though fully set forth herein.

129. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class against Defendants. Alternatively, Plaintiff Leslie Flaherty brings this claim on behalf of herself and the California Class against Defendants.

130. California Business & Professions Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

131. Defendants caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiffs and the Class members.

132. Defendants violated section 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of their Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

133. Plaintiffs and Class members have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or

deceptive practices. In purchasing or leasing their Class Vehicles, Plaintiffs and the Class members relied on the misrepresentations and/or omissions of Defendants with respect to the safety and reliability of the Class Vehicles. Defendants' representations and/or omissions were untrue because the Class Vehicles are distributed with a defective engine. Had Plaintiffs and the Class members known this, they would not have purchased or leased their Class Vehicles or paid as much for them. Accordingly, Plaintiffs and the Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

134. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' businesses. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of California and nationwide.

135. Plaintiffs, individually and on behalf of the Class members, request that this Court enter such orders or judgments as necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the Class members any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief permitted.

## FOURTH CAUSE OF ACTION

## VIOLATION OF THE SONG-BEVERLY ACT – BREACH OF IMPLIED WARRANTY (CAL. CIV. CODE §§ 1792, 1791.1, *ET SEQ.*)

**(On Behalf of the Nationwide Class or, Alternatively, the California Class)**

136. Plaintiffs and the Classes incorporate by reference all paragraphs as though fully set forth herein.

137. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class against Defendants. Alternatively, Plaintiff Leslie Flaherty brings this claim on behalf of herself and the California Class against Defendants.

138. At all relevant times hereto, Defendants were the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendants knew or should have known the specific use for which the Class Vehicles were purchased.

139. Defendants provided Plaintiffs and Class members with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. The Class Vehicles, however, are not fit for their ordinary purpose because, *inter alia*, the Class Vehicles and their engines contained an inherent defect at the time of sale that causes the Class Vehicles to experience premature and catastrophic engine failure and fire.

140. The Class Vehicles are not fit for the purpose of providing safe and reliable transportation because of the Engine Defect.

141. Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, *inter alia*, the following: (i) a warranty that the Class Vehicles and engines manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation and would not prematurely and catastrophically fail or catch fire; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use – providing safe and reliable transportation – while the Class Vehicles were being operated.

142. Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose. Instead, the Class Vehicles are defective, including, but not limited to, the Engine Defect and/or manufacturing of the GDI engines.

143. Defendants' actions, as described herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide and California State Classes, respectfully request that the Court enter judgment in their favor and against the Defendants, as follows:

A. Certification of the proposed Nationwide and California State Classes, including appointment of Plaintiffs as class representatives and appointment of Plaintiffs' counsel as Class Counsel;

B. Damages, including actual, compensatory, general, special, incidental, statutory, punitive, and consequential damages, costs, and disgorgement in an amount to be determined at trial;

C. An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

D. Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendants to repair, recall, and/or replace the Class vehicles or, at a minimum, to provide Plaintiffs and Class members with appropriate curative notice regarding the existence and cause of the Defect;

E. An award of reasonable costs and attorney fees; and

F. Such other or further relief as may be appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial for all claims so triable.

Dated: December 14, 2018

Respectfully submitted by,

HAGENS BERMAN SOBOL SHAPIRO LLP

By: *<u>/s/ Christopher R. Pitoun</u>*
Christopher R. Pitoun
301 N. Lake Ave., Suite 920
Pasadena, CA 91101
Tel.: (213) 330-7150
Fax: (213) 330-7152
Email: christopherp@hbsslaw.com

Steve W. Berman (*pro hac vice* to be filed)
HAGENS BERMAN SOBOL
SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel.: (206) 623.7292
Fax: (206)623.0594
Email: steve@hbsslaw.com

Robert Hilliard (*pro hac vice* to be filed)
HILLIARD MUÑOZ GONZALES L.L.P.
719 S Shoreline Blvd, Suite #500
Corpus Christi, TX 78401
Tel.: (361) 882-1612
Fax: (361) 882-3015
Email: bobh@hmglawfirm.com