QUINN EMANUEL URQUHART & SULLIVAN, LLP
 Shon Morgan (Bar No. 187736)
 shonmorgan@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:  (213) 443-3000
Facsimile:   (213) 443-3100
 Christine W. Chen (Bar No. 327581)
 christinechen@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:  (415) 875-6600
Facsimile:   (415) 875-6700
 Cristina Henriquez (Bar No. 317445)
 cristinahenriquez@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:  (650) 801-5000
Facsimile:   (650) 801 5100

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| *In re: Hyundai and Kia Engine Litigation II* | CASE No.  8:18-cv-02223-JLS-JDE <br><br> Hon. Josephine L. Staton <br><br> **JOINT SUPPLEMENTAL BRIEF IN SUPPORT OF PRELIMINARY SETTLEMENT APPROVAL (DKT. 86)** |

This joint submission addresses the three issues raised by the Court in its December 14, 2022 order (Dkt. 86) relating to preliminary settlement approval:

1. Defendants' settlement administrators and their qualifications;

2. Opt-out procedures; and

3. Material differences between the proposed settlement and the settlement approved in *In re: Kia Engine Litigation ("Engine I")*, Case No. 8:17-cv-00838-JLS-JDE (C.D. Cal.).

## I.  PROPOSED SETTLEMENT ADMINISTRATORS AND THEIR QUALIFICATIONS

The parties' respective statements on claims administration are set forth below. Each defendant is committed to administer the settlement fairly, efficiently, and impartially.  As in the *Engine I* settlement, Hyundai intends to self-administer, assisted this time by Sedgwick Claims Management Services, Inc.  Kia will again retain Epiq Class Action & Claims Solution, Inc. for settlement administration. Each defendant will build upon the experience obtained from the *Engine I* settlement.

Among the many refinements in the *Engine II* settlement, the parties sought to streamline the claims administration process and include more objective criteria. For example, the parties revised the definition of "Exceptional Neglect" to include specific oil change gaps, which will minimize the role of subjective assessment of the vehicle's condition and ensure consistent decisions across claims.  Dkt. 79-2 at 7-8. Similarly, the definition of a "Qualifying Repair" has been broadened so claims reviewers need not identify references to connecting rod bearing wear, in recognition that repair records might lack detail on the cause of any engine issue.  *Id.* at 15-16.

In addition, as described below, the Settlement Agreement requires defendants to notify Class Counsel in certain situations in order to ensure claims are not being inappropriately denied or delayed.  *See, e.g.*, *id.* at 9.  As a crosscheck and to ensure the effectiveness of the claims administration process, Class Counsel will again have significant involvement in the settlement administration.

### A.   <u>Hyundai's Statement Concerning Self-Administration</u>

As noted in *Engine I*, Hyundai has self-administered numerous class action settlements. *See Engine I*, Dkt. 127 at 5-7; *Wylie v. Hyundai Motor Am.*, No. 8:16-cv-021202-DOC-JCG (C.D. Cal.) (granting final approval of a settlement self-administered by Hyundai and worth $11-22 million for a class of 135,000 members); *Kearney v. Hyundai Motor Am.*, No. SACV 09-01298-JST (MSGx) (C.D. Cal.) (granting final approval of settlement self-administered by Hyundai, which included Hyundai mailing 640,000 members an information pamphlet, making available a calibration software update, and a potential refund or exchange to a subset of class); *Mendoza v. Hyundai Motor Co., Ltd.*, No. 15-cv-01685-BLF (N.D. Cal.) (granting final approval of settlement self-administered by Hyundai, in which over 1.3 million class members were notified).  Hyundai continues to successfully self-administer the *Engine I* settlement, as reflected in Class Counsels' reports to the Court.  *See, e.g.*, *Engine I*, Dkt. 207 at 5 ("HMA fairly followed the terms of the settlement agreement and seemed to err on the side of the Class Member.").

#### 1.   <u>Hyundai's Plan Builds Upon Its Work in *Engine I*</u>

Hyundai's self-administration plan remains largely similar to the Court-approved *Engine I* plan both in terms of class notices and claims processing.  The only notable difference is that Hyundai is using Sedgwick Claims Management Services, instead of JNR, to assist Hyundai with the initial claims review.  Hyundai and Sedgwick will build upon the experience obtained from the *Engine I* settlement.

<u>Settlement Notices.</u>  As in *Engine I*, notices will be sent in multiple ways to reach as many Class members as possible.  A third party, like S&P Global or R.L. Polk & Company (now owned by S&P Global), who assisted Hyundai in the *Engine I* settlement, will use identifying information provided by Hyundai to obtain the names and most current addresses of Class members. Dkt. 79-2 at 38; Declaration of Elizabeth Fernandez ("Fernandez Decl.") ¶ 2.  Before mailing individual notices, Hyundai will also obtain updated information for Class members using the U.S. Postal

Service's National Change of Address database. Fernandez Decl. ¶ 2. Hyundai will then send Court-approved notices via U.S. mail with the help of an experienced third-party, such as Leafa Printing Plus, and by electronic mail to all Class members for whom Hyundai has an email address on file. *Id.* For notices returned as undeliverable, Hyundai will conduct an advanced address search using HMA's customer database information to obtain a deliverable address. *Id.* ¶ 4. Hyundai maintains address information for all original owners and lessees who purchased or leased their vehicles from authorized Hyundai dealerships. *Id.* ¶ 3. This internal database is updated whenever Hyundai is contacted by owners or lessees about their vehicles or receives updated information through its marketing channels. *Id.* For 90 days after the Notice Date, Hyundai will periodically update Class Counsel regarding the status of notice delivery and the number of responses received by Class members. Dkt. 79-2 at 9.

Furthermore, as in *Engine I*, Hyundai will distribute the pamphlet described in the Settlement Agreement, *see* Dkt. 79-2 at 12, via U.S. mail and electronic mail to Class members and to Hyundai's authorized dealerships. Fernandez Decl. ¶ 5. The dealerships will be instructed to not only distribute the pamphlet to customers, but to also provide other potentially helpful information about Hyundai's product improvement campaigns, such as Hyundai's KSDS Installation Campaign, to any person who presents a Class Vehicle for maintenance. *Id.*

Claims Processing. Hyundai will complement its self-administration with an experienced third-party claims administrator for claims processing. Sedgwick is experienced in class action administration and is familiar with the framework for *Engine II* because it also assisted Hyundai with the *Engine I* claims processing. It is the largest claims administrator in the world, with more than 30,000 employees. *About Us*, SEDGWICK, https://www.sedgwick.com/about-us (last accessed Jan. 10, 2023). Since 1969, Sedgwick has been providing claims processing services for thousands of class actions, across numerous areas of law. *Id.* In particular, Sedgwick,

which acquired another claims administrator JND Legal Administration, has extensive experience in administrating complex and large class actions for automobile companies that involve millions of phone calls and tens of millions of claims submissions. *Sedgwick acquires JND Legal Administration*, Sᴇᴅɢᴡɪᴄᴋ, https://www.sedgwick.com/news/2021/sedgwick-acquires-jnd-legal-administration (Dec. 7, 2021). Sedgwick's multi-lingual claims processing team will be fully utilized and devoted to this matter to assist Class members.  Fernandez Decl. ¶ 6.

Sedgwick will conduct an initial review of all claims.  Hyundai understands Sedgwick will commit approximately 50–100 employees to this process.  *Id.* ¶ 7. Sedgwick will ensure all requested documents are saved and confirm essential information such as VIN, mileage, relevant dates, repair orders, and the amount(s). *Id.*  If the claim is straightforward and all supporting documents are included in the claim, Sedgwick will approve the claim.  *Id.*  If there is uncertainty about a particular claim, Hyundai's consumer assistance department will review whether the claim should be approved or denied.  *Id.* ¶ 8.  Such situations could occur when an independent repair facility does not clearly document a repair, there are missing repair orders, or a customer claims to be entitled to remedies beyond those offered in the settlement.  *Id.*  If there continues to be uncertainty regarding specific claims or if claimants indicate they may appeal claims denied in whole or in part, Hyundai's legal department will conduct an additional assessment.  *Id.* ¶ 9.  Hyundai's consumer assistance department will also perform a final review of all claims above a certain minimum dollar threshold to ensure that such high-value claims are properly addressed and to check for fraudulent claims.  *Id.*  Any remaining claimants with concerns may seek arbitration through a BBB-administered alternative dispute resolution process. Dkt. 79-2 at 31-34.[1]  Thus, a neutral third party is the final arbiter

---

[1]   The Long Form Notices have been amended to clarify that claimants must first write to Hyundai and Kia regarding an appeal to seek arbitration through the BBB.

of the amount paid to Class members with concerns about Hyundai's initial decision.

*Engine I* Results.  Hyundai's administration has been successful in *Engine I* in reaching thousands of claimants and efficiently providing reimbursements for eligible claims.  Hyundai sent 6,540,269 class settlement notices via mail and 3,449,895 via email, with only about 6% of the U.S. mail being undeliverable on the first attempt and 12% of email notices bouncing back.  *Engine I*, Dkt. 143-1 at 6-7.

Because no end date exists for *Engine I* Class members to submit claims for certain settlement benefits, the following statistics are current as of December 12, 2022.  Hyundai has received 72,398 claims and issued final determinations for 99.9% or 72,383 claims.  Fernandez Decl. ¶ 12.  Only about 3% of claims were appealed to the BBB, and notably the majority of disputes escalated to the BBB were resolved in Hyundai's favor, confirming that the *Engine I* settlement is being administered effectively.  *Id.*

> 2.  Hyundai Is Incentivized to Devote Substantial Resources and Hyundai's Expertise Is Necessary for Claims Processing

Hyundai's commitment to the expedient and fair administration of class settlements remains unchanged from *Engine I*.  Hyundai will prioritize identification of Class Vehicles to ensure notices are properly sent to eligible Class members.  *Id.* ¶ 2.  Furthermore, Hyundai will once again prepare dedicated customer service representatives and employees knowledgeable with the terms of this settlement, with additional agents constantly available to assist if needed, to resolve any questions regarding the settlement and to review, confirm, and issue the reimbursements for eligible claimants efficiently and consistently.  *Id.* ¶ 10.

As before, Hyundai is incentivized to devoting resources to the efficient and fair administration of settlements because Hyundai's primary interest is in protecting its customer relations and retaining long-term customers who remain loyal to the Hyundai brand.  *Engine I*, Dkt. 127 at 8.  Hyundai takes pride in its loyal customer base, and will continue to foster brand loyalty by treating its customers fairly.

Finally, as in *Engine I*, certain facets of the settlement will benefit from Hyundai's involvement and/or expertise beyond that expected of typical third-party administrators.   For example, certain "loss of value" claims will require determinations whether such losses were directly related to a connecting rod bearing failure or symptom.  Dkt. 79-2 at 27-28.  In addition, the settlement contemplates that Hyundai's authorized dealerships will conduct warranty inspections and, if appropriate, repair Class Vehicles; provide loaner vehicles in conjunction with any qualifying repair;  implement any additional customer satisfaction or  goodwill consideration at Hyundai's discretion; and provide information to Hyundai regarding reimbursement of qualifying past repairs.  *See, e.g.*, Dkt. 79-2 at 17-19.

**B.   Kia's Statement On Its Use Of Third-Party Administrator**

Kia intends to retain Epiq, its administrator in *Engine I*.  As described to the Court in *Engine I*, Epiq has "ample experience with settlement administration in large and complex cases, has partnered with Kia in past settlements, and will ensure this settlement is administered in a fair and reasonable manner."  *Engine I*, Dkt. 134 at 2.

1.   Epiq is Well-Qualified to Administer *Engine II*

As the Court noted in *Engine I*, Epiq has been a leading settlement administrator since 1993 with ample experience administering complex class actions involving millions of class members and claims.  *Engine I*, Dkt. 137 at 1-2; *Engine I*, Dkt. 134 at 1–2; see *also* Declaration of Cameron R. Azari ("Azari Decl.") ¶ 4.  Courts have consistently recognized Epiq's experience in settlement administration and approved of its work.  *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, MDL No. 2672 CRB (JSC), 2018 WL 6198311, at *8 (N.D. Cal. Nov. 28, 2018) ("The Court is satisfied with and approves the selection of Epiq, which is a firm that also served as the notice and claims administrator for the Bosch class action settlement."); *In re Merck & Co., Inc. Sec., Derivative & "Erisa" Litig.*, MDL No. 1658 (SRC), 2016 WL 7486326, at *3 (D.N.J. Feb. 11, 2016) (approving Epiq to administer notice procedure and process claims); *MI Windows &*

*Doors, Inc.*, MDL No. 2333, 2015 WL 12850546, at *5 (D.S.C. Feb. 27, 2015) (same); *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, MDL No. 09-2067-NMG, 2014 WL 4446464, at *2 (D. Mass. Sept. 8, 2014) (same).

Most notably, Epiq has worked with Kia and Class Counsel in successfully administering the similarly complex Settlement Agreement from *Engine I* and will build upon the experience obtained from the *Engine I* claims administration.

Epiq has developed an effective claims processing system throughout its time administering *Engine I* and will implement it here.  As in *Engine I*, Kia will ensure that Epiq is provided with all information necessary to review, process, and resolve submitted claims.  Epiq's highly sophisticated proprietary software system will not only store the information provided by Kia, but will also ensure that the information provided is accurate (*e.g.*, confirmation that the VIN matches with the vehicle identified).  Azari Decl. ¶ 12.  Epiq has been diligent in informing Kia of any deficiencies in claims submitted for *Engine I* and has worked well with Kia to notify claimants to resolve the deficiencies efficiently.  It intends to do the same here.  Of course, Class members will always have the option to speak with an Epiq representative for assistance at any point in the claims administration process.  *Id.* ¶ 17.  Epiq will initially staff service representatives at a level appropriate for the size of the Settlement and will adjust up or down relative to the volume of calls received to ensure Class members' concerns and questions are addressed as quickly and as accurately as possible.  *Id.*

Also as in *Engine I*, claimants have a robust appeal process if not satisfied with the reimbursement determination made by Kia and Epiq.  If a claimant and Kia are not able to resolve a dispute within 30 days, a claimant can initiate a BBB-administered alternative dispute resolution process.  Dkt. 79-2 at 32-35.

Epiq has demonstrated from *Engine I* that it is well-qualified to administer *Engine II*, which will involve the same notice procedures and similar claims and issues.  Coordinating with Kia and IHS Markit, Epiq mailed 4,102,570 notices,

sending notices to updated addresses where necessary, and emailed 2,859,699 notices. *Engine I*, Dkt. 143-1 at 11-15. Epiq was able to reach all but 317,523, or only about 5.5%, of all Kia Class members. *Id.* at 15. Epiq has also processed tens of thousands of claims. As of December 14, 2022, Epiq has issued final determinations for all the 52,731 claims submitted. Azari Decl. ¶ 6. Only 132 of the final determinations were escalated to the BBB, and, of those, 109 were resolved in Kia's favor. *Id.* The fairness and efficiency of Epiq's claims processing is demonstrated by the low number of claims escalated to the BBB.

### 2. Epiq Has Remedied Class Counsel's Concerns from *Engine I*

After finding a sample of fire claims from *Engine I* that might warrant re-review, Class Counsel requested Kia and Epiq to provide all fire claims for Class Counsel's review. *Engine I*, Dkt. 207 at 3. Kia and Epiq provided documentation relating to more than 500 fire claims, and Class Counsel flagged 38.5% for re-review. *Id.* at 4. Class Counsel was mainly concerned with: (1) Epiq's interpretation of the settlement; (2) possible miscommunication between Epiq and Class members; and (3) errors in reviewing fire-related claims. *Id* at 4-5.

Epiq worked with Kia and Class Counsel to address these concerns. As a result, Class Counsel reported they were "satisfied" the claims process was working adequately. *Engine I*, Dkt. 216 at 4. Epiq's experience from the *Engine I* administration and its collaboration with Class Counsel will serve the Class members in the *Engine II* settlement well. In addition, Epiq has provided valuable feedback to the parties to improve *Engine II*'s administration, suggesting changes to add clarity and objectivity into the settlement based on its experience in *Engine I*. Those changes were approved by Class Counsel and implemented in the *Engine II* Settlement Agreement. In addition, as described below, the Settlement Agreement requires defendants to notify Class Counsel of any findings of Exceptional Neglect, and Class Counsel can request documentation that formed the basis of the Exceptional Neglect determination in order to ensure claims are not being inappropriately denied. Dkt.

79-2 at 9.  Thus, Class Counsel's direct involvement in the claims process will ensure that the issues from *Engine I* do not reoccur here.

C.   <u>Class Counsel's Statement on Claims Administration Oversight</u>

The parties have conferred extensively concerning defendants' settlement administration plans for *Engine II*.  In *Engine I*, Class Counsel has expended over 3,200 total hours overseeing the settlement to date, (and these efforts are ongoing), assisting Class members with the claims process, and auditing claims, and they intend to commit similar resources to the oversight and administration of the proposed settlement here.

As in *Engine I*, defendants will provide ongoing reports to Class Counsel. Class Counsel will be notified of and be involved in the claims processing.  Hyundai and Kia will periodically update Class Counsel about the number of notices sent and those returned as undeliverable.  Dkt. 79-2 at 39.  Hyundai and Kia will also notify Class Counsel of any determination of Exceptional Neglect, to ensure Class Counsel has oversight over defendants' evaluation of this exclusion.  *Id.* at 9.  Furthermore, whenever defendants request proof of payment from claimants due to suspicion of fraud, defendants must also notify Class Counsel.  *Id.* at 13.  Additionally, defendants must provide a monthly report to Class Counsel regarding claims received, each claim's status, any final determinations made, and any claims escalated to the BBB. *Id.* at 36.  At Class Counsel's request, defendants will provide them copies of the underlying documentation for denied claims, including those denied on the basis of Exceptional Neglect or failure to install the KSDS, so Class Counsel may evaluate the claim determination.  *Id.* at 9, 36.

II.   <u>THE PARTIES' STATEMENT ON OPT-OUT METHODS</u>

The parties agree with the Court that Class members should have the option to submit electronic exclusion requests.  The parties have accordingly amended the

Long-Form Notices to inform Class members they may opt-out online or by mail.[2] Exhs. A, B, C, D.  The parties have also prepared a draft text of the electronic opt-out form, which will be available on the settlement websites. Ex. E.  The parties do not believe changes are required to the Settlement Agreement itself because it refers Class members to the Notice for details on how to submit an exclusion request. Dkt. 79-2 at 45.  Claims submitted online will be managed in the same manner as written exclusion requests.

### III.   THE PARTIES' STATEMENT ON MATERIAL DIFFERENCES FROM *ENGINE I*

As mentioned above, the parties' experiences in the *Engine I* settlement contributed to the negotiated settlement in this case.  Below is the parties' discussion of the substantive differences between this settlement and the settlement in *Engine I*. The parties also prepared a chart, attached here as Exhibit F, that provides a comprehensive comparison of the differences for the Court.

### A.   The Extended Warranty

Starting with the extended warranty offered in this case, Class members will receive a 15-year/150,000-mile extended warranty. Dkt. 79-2 at 17.  In *Engine I*, the warranty provided was a lifetime warranty.  As explained in the preliminary approval briefing, plaintiffs initially sought lifetime warranties as they did in *Engine I*, but safety considerations subsequently raised by NHTSA indicated that an extended warranty for the anticipated useful life of the vehicle would be more appropriate. Dkt. 81-1 at ¶¶ 8-11. Specifically, in ongoing communications between HMA and NHTSA about the alleged defect, a concern was recognized that a lifetime warranty could create a public safety risk by incentivizing consumers to drive vehicles longer than their contemplated useful lives.  *Id.*  NHTSA's view was that as the non-warranted

---

[2]   The Long-Form Notices have also been amended to include mailing addresses for where Claimants should submit appeals.

vehicle systems (*e.g.*, steering, braking, and general automotive safety) would deteriorate over time and cause safety hazards to both drivers and the public alike, Class members might be less likely to perform the necessary vehicle maintenance or purchase newer vehicles with innovative safety features if their engines were warranted for life. *Id.*

The definition of the parts covered by the warranties are substantially similar. In *Engine I*, the warranty covered the "short block assembly, consisting of the engine block, crankshaft and bearings, connecting rods and bearings, and pistons" and "any damage caused to the long block assembly due to connecting rod bearing failure." *Engine I*, Dkt. 194-1 at 7. Here, the extended warranty covers "damage caused by a connecting rod bearing failure to the original or genuine replacement short block assembly, consisting of the engine block, crankshaft and bearings, connecting rods and bearings, and pistons" and "any damage caused to the original or genuine replacement long block assembly (excluding accessory engine components) that is a result of a connecting rod bearing failure." Dkt. 79-2 at 9.

The proposed settlement here also features increased caps for loaner or rental cars in connection with securing warranty repairs. In *Engine I*, Class members were eligible to receive reimbursement for a comparable class of loaner vehicle if requested and, if none were available, they were eligible for up to $40 per day in rental car expenses. *Engine I*, Dkt. 194-1 at 12. Here, that cap is doubled to $80 per day, and also includes rental car, ride sharing, or other transportation expenses. Dkt. 79-2 at 18. In addition, if the Class member is awaiting engine repair for at least three months, defendants will use their best efforts to prioritize them for a loaner vehicle from a dealership after being notified by Class Counsel. *Id.*

Many of the other benefits of the extended warranty are the same as in *Engine I*. The extended warranty again covers all costs associated with inspections and repairs, including replacement parts, labor, diagnoses, and mechanical or cosmetic damage. Dkt. 79-2 at 17. The extended warranty is also transferrable to subsequent

owners, and not applicable to commercial entities such as used car dealerships or automobile auction houses. *Id.* at 9-10. Defendants cannot deny inspections or repairs under the warranty on the grounds of a failure to properly maintain the vehicle (other than for Exceptional Neglect and, in certain cases, KSDS Installation Neglect, discussed below). *Id.* at 18. Further, the 90-day period for free inspections for Class Vehicles that have not yet received inspections is available again, limited to the period of the Extended Warranty.[3] *Id.* at 17.

In *Engine I*, defendants had the option to buy back any vehicles that needed a new engine that were at or above 150,000 miles or in service for more than eight years. *Engine I*, Dkt. 194-1 at 8. Here, because the warranty does not extend past 150,000 miles, there is no buyback option.

Finally, in *Engine I*, to receive warranty coverage, KSDS needed to have been installed before the engine failure. *Id.* at 7. Here, KSDS installation is still required for warranty repairs in most instances, but if the vehicle was subject to a recall, KSDS installation is not a prerequisite. Dkt. 79-2 at 11.

## B. <u>Exceptional Neglect</u>

In *Engine I*, the criteria for what constituted Exceptional Neglect had subjective elements. Specifically, Exceptional Neglect would apply if the vehicle evidenced a lack of maintenance or care for a significant period of time not less than one year, such that it appeared dilapidated, abandoned, and/or beyond repair, or there was a failure to have the KSDS installed within 60 days of the notice date or the mailing of the KSDS campaign notice, whichever was later. *Engine I*, Dkt. 194-1 at 6-7.

Here, based on the parties' experiences in *Engine I*, the definition of Exceptional Neglect has been revised ensure it is applied more objectively across claims. Exceptional Neglect in *Engine II* means the vehicle's condition evidences

---

[3] The settlement also clarifies that the free inspections are limited to assessing whether the vehicle has symptoms of connecting rod bearing failure and that if Class members want any other issues diagnosed or inspected, then they must pay for it.

lack of maintenance or care **and** its maintenance records reveal severe, unacceptable gaps in regular oil changes, specifically: (1) one oil change gap of greater than 10,500 miles, (2) one oil change gap of greater than 14 months, or (3) the vehicle was previously diagnosed with excessive oil consumption issues but did not obtain repair to address those issues within 30 days or 1,000 miles, whichever comes first, subsequent to any completed oil consumption testing and confirmed diagnosis. Dkt. 79-2 at 7-9. Unlike in *Engine I*, defendants and claimants together shoulder the burden to search for and produce supporting records. Where Exceptional Neglect is suspected, defendants will verify oil change records and request maintenance records from their dealerships and from reputable third-parties like Carfax. *Id.* at 8. Defendants can also request records from Class members. *Id.*

For Extended Warranty claims, Exceptional Neglect may apply where a physical inspection of the vehicle's engine shows unacceptable lacquering, varnish, or sludge, and the vehicle's service records demonstrate unacceptable gaps in its regular oil changes (recounted above). *Id.* at 7. Defendants or their dealerships will inspect the vehicle to identify potential Exceptional Neglect. *Id.* at 8.

For non-Extended Warranty claims, Exceptional Neglect may apply where evaluation of available service records and submitted documentation suggests a lack of maintenance or care (*i.e.*, outside of factory maintenance and care specifications), *e.g.*, repair orders or service records noting engine oil sludge, engine coolant in oil, oil that smells burnt, an old filter in the engine, very low levels of drained oil, or other similar indicia of neglect, and the vehicle's service records demonstrate unacceptable gaps in its regular oil changes (recounted above). *Id.* at 7-8. For these non-Extended Warranty reimbursement claims, the Class member will be notified if Exceptional Neglect is suspected based on the Class member's records and submitted documentation. *Id.* at 8. Finally, as described above, defendants are required to notify Class Counsel of all Exceptional Neglect determinations for reimbursement claims on a monthly basis and will provide documentation supporting said determinations if

1  requested.  *Id.* at 36.

2       In addition, the failure to obtain KSDS has been separated out into its own

3  definition under KSDS Installation Neglect, *see infra* Section III.D, to make clear to

4  Class members the basis for a denial for either a vehicle's condition or lack of KSDS

5  installation.  Dkt. 79-2 at 11.

6       **C.     Reimbursements and Other Payments**

7       The proposed settlement here offers increased value for reimbursement claims

8  compared to *Engine I*.  The logistics of submitting a claim are largely the same:

9  claims for repairs conducted prior to the notice date can be submitted within 90 days

10  of the final approval order, and require a completed Claim Form, Proof of Ownership,

11  Proof of Qualifying Repair, and Proof of Payment.  Dkt. 79-2 at 22.  Claims can be

12  submitted regardless of whether the repairs were done at Defendants' dealerships, or

13  an independent, verified repair shop.  *Id.* at 13.

14       As described above, rental car reimbursements in *Engine I* were capped at $40

15  per day and limited to only rental cars.  *Engine I*, Dkt. 194-1 at 16-17.  Here, however,

16  the cap for transportation reimbursements (for both Extended Warranty and non-

17  Extended Warranty claims) is doubled to $80 per day and expands the benefit to ride-

18  sharing expenses such as rides from Uber and Lyft, and other transportation expenses.

19  Dkt. 79-2 at 18, 22.  In addition, the settlement allows for Class members to claim

20  reimbursement for transportation costs incurred between 15 business days before

21  delivery to a repair shop and 3 business days after being notified that repair is

22  complete.  *Id.* at 23.  This more clearly defines *Engine I*'s requirement that rental car

23  costs had to be "reasonably related" to a repair, *Engine I*, Dkt. 194-1 at 16-17, and

24  encourages Class members to promptly pick up their repaired vehicles.

25       Payments for inconveniences due to repair delays have also been increased in

26  the proposed settlement, with the goal to better compensate Class members

27  experiencing lengthier delays. In *Engine I*, the payment amounts were:  $50 for delays

28  of 61-90 days and $25 for each additional 30-day period (*i.e.*, $50 for delays lasting

61-90 days, $75 for delays lasting 91-120 days, and so forth.).  *Engine I*, Dkt 194 at 18.  Here, the payments are:  $75 for delays of 61-180 days; $100 for 181-210 days; and $100 for each additional 30-period of delay (*i.e.*, $100 total for delays of 181–210 days, $200 total for delays of 211-240 days, $300 total for delays of 241-270 days, and so forth).  Dkt. 79-2 at 24.

This proposed settlement also adds a new category of incidentals payments, which was not included in *Engine I*.  When a Qualifying Failure/Fire occurs, Class members are eligible for reimbursement of $125 for transportation expenses if the incident occurred within 150 miles of the Class members' residence.  Dkt. 79-2 at 25. If the Qualifying Failure/Fire occurred more than 150 miles from the Class members' residence, they are eligible for reimbursement for the actual costs of transportation, lodging, and reasonable meal expenses for a maximum of three days, up to $300 for the first day, $200 for the second day, and $100 for the third day.  *Id.*

Class members who experienced a Qualifying Failure/Fire and traded or sold their Class Vehicles before obtaining repair are eligible for a $150 payment plus the baseline Black Book value at the time of loss, subject to an adjustment for the actual value received in the sale.  *Id.* at 27.  If the actual value received was nominal, or the Class member donated the vehicle, then reimbursement will be calculated using an actual value of $500.  *Id.* at 27-28.  In *Engine I*, the payment was $140 plus the baseline Black Book value, with no corresponding provision for nominal value or vehicle donations.  *Engine I*, Dkt. 194-1 at 18.

In *Engine I*, Class members were eligible for a $140 goodwill payment if they were denied a warranty repair by defendants' dealerships and then had the repair performed elsewhere.  *Id.* at 16.  Here, Class members are eligible for a $150 goodwill payment.  Dkt. 79-2 at 21.

Similarly, in *Engine I*, Class members were eligible for a $140 goodwill payment for Class Vehicles destroyed by a fire plus the maximum Black Book value at the time of the loss, minus the actual value received.  *Engine I*, Dkt. 194-1 at 20.

Here, Class members are eligible for a $150 goodwill payment plus the maximum Black Book value at the time of the loss, minus the actual value received. *Engine II*, Dkt. 79-2 at 28.

The rebate amounts have also increased in the proposed settlement. In *Engine I*, Class members that experienced engine failure/fire, lost faith in their vehicles due to the settlement, sold or traded their vehicle, and purchased a replacement Hyundai or Kia vehicle could obtain a rebate payment based on the difference between the documented trade/sale price and the maximum Black Book value of the Class Vehicle (at the time of KSDS campaign launch) up to the following amounts: $2,000 for MY 2011-2012 Class Vehicles; $1,500 for MY 2013 and 2014 Class Vehicles; $1,000 for MY 2015 and 2016 Class Vehicles; $500 for MY 2017, 2018, and 2019 Class Vehicles. *Engine I*, Dkt. 194-1 at 21-22. Here, the rebate is calculated as the difference between the value the Class member received at sale/trade-in to the Class Vehicle's maximum Black Book value (at the time of KSDS campaign launch), irrespective of any underlying loans, up to the following amounts: $2,500 for MY 2010, 2011, and 2012 Class Vehicles; $2,000 for MY 2013 and 2014 Class Vehicles; $1,500 for MY 2015 and 2016 Class Vehicles; $1,000 for MY 2017, 2018, 2019, 2020, and 2021 Class Vehicles. Dkt. 79-2 at 29-30.

### D.    KSDS Installation Requirements

In *Engine I*, lifetime warranty repairs were denied if the KSDS was not installed before the engine failed, and non-warranty/reimbursement claims were denied if the KSDS was not installed within 60 days of the notice date or the KSDS campaign mailing notice date, whichever was later. *Engine I*, Dkt. 194-1 at 7-8.

Here, the period to install the KSDS and obtain non-Extended Warranty/reimbursement benefits is extended to 150 days of the Notice Date, and failure to install the KSDS will not bar claims if the incident occurred before 150 days following the Notice Date and before the KSDS installation. *Engine II*, Dkt. 79-2, at 11. As in *Engine I*, the KSDS must generally be installed before the engine failure to

obtain repairs under the Extended Warranty. *Id.*  To obtain other benefits under the settlement (*e.g.*, transportation reimbursement, payment for incidentals), the KSDS installation must occur within 150 days from the Notice Date. *Id.*

The definition for KSDS Installation Neglect also recognizes that Class members should not be penalized in situations where Hyundai or Kia dealers should have installed KSDS for Class Vehicles before re-selling them. *Id.*  While this was resolved in practice in Class members' favor in *Engine I* on a case-by-case basis, the *Engine II* settlement clarifies how this scenario should be resolved.   Relatedly, the Settlement Agreement documents defendants' commitment to notify subsequent owners of the Class Vehicles about getting KSDS installed based on monthly owner change reports for at least a year. *Id.* at 10-11.

DATED:  January 13, 2023          QUINN EMANUEL URQUHART & SULLIVAN. LLP

By _____*/s/ Shon Morgan*_____
Shon Morgan
*Attorneys for Defendants*

DATED:  January 13, 2023          HAGENS BERMAN SOBOL SHAPIRO  LLP

By_____*/s/ Rachel E. Fitzpatrick*_____
Steve W. Berman (*pro hac vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Matthew D. Schelkopf (*pro hac vice*)
Joseph B. Kenney (*pro hac vice*)
SAUDER SCHELKOPF LLC
1109 Lancaster Avenue
Berwyn, PA 19312
Telephone: (610) 200-0581
Facsimile: (610) 421-1326
mds@sauderschelkopf.com
jbk@sauderschelkopf.com

*Interim co-Lead Counsel*

Gretchen Freeman Cappio (*pro hac vice*)
Ryan McDevitt (*pro hac vice*)
Adele Daniel (*pro hac vice*)
Keller Rohrback L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
gcappio@kellerrohrback.com
rmcdevitt@kellerrohrback.com
adaniel@kellerrohrback.com

*Settlement Counsel*

Bonner C. Walsh (*pro hac vice*)
Walsh PLLC
1561 Long Haul Road
Grangeville, ID 83530
Telephone: (541) 359-2827
Facsimile: (866) 503-8206
bonner@walshpllc.com

Adam Gonnelli (*pro hac vice*)
Law Office of Adam R. Gonnelli, L.L.C.
707 Alexander Road
Bldg. 2, Suite 208
Princeton, NJ, 08540
Telephone: (917) 541-7110
Facsimile: (315) 446-7521
adam@arglawoffice.com

1

2

3

4

5

Rachel E. Fitzpatrick (*pro hac vice*)
Hagens Berman Sobol Shapiro LLP
11 W. Jefferson Street, Suite 1000
Phoenix, AZ 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
rachelf@hbsslaw.com

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ECF ATTESTATION**

I, Shon Morgan, attest that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the e-filing of the foregoing document in compliance with Local Rule 5-4.3.4(a)(2).


By _____*/s/ Shon Morgan*_____
Shon Morgan