JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| | CASE NO. 8:18-cv-02223-JLS-JDE |
| IN RE: HYUNDAI AND KIA ENGINE LITIGATION II | **ORDER: (1) GRANTING CLASS COUNSEL'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT (DOC. 105); AND (2) GRANTING IN PART CLASS COUNSEL'S MOTION FOR ATTORNEY FEES, COSTS, AND CLASS REPRESENTATIVE SERVICE AWARDS (DOC. 106)** |

Before the Court are two motions filed by Class Counsel: one for final approval of a class action settlement and another for attorney fees, costs, and class-representative service awards.  (Final Approval Mot., Doc. 105; Atty. Fees Mot., Doc. 106.)  Defendants Hyundai Motor Company, Hyundai Motor America, Kia America, Inc., and Kia Corporation opposed the motion for attorney fees, and Class Counsel replied.  (Atty. Fees Opp., Doc. 120; Reply ISO Atty. Fees Mot., Doc. 123.)  Class Counsel also filed supplemental briefs in support of their motion for final approval, which addressed objections filed by class members.  (Supp. Br. re: Objections, Doc. 131; Second Supp. Br. re: Objections, Doc. 159.)

Having reviewed the papers, held a final fairness hearing, and taken the matter under submission, the Court (1) GRANTS the motion for final approval; and (2) GRANTS IN PART the motion for attorney fees, costs, and class representative service awards.[1]  The Court awards $3,404,900.14 in attorney fees—with $1,814,591.50 attributable to the *Engine I* firms' work, and $1,590,308.64 attributable to the *Short* firms' work.  The Court awards $166,200.61 in litigation costs—with $38,857.72 for costs incurred by the *Engine I* firms, and $127,342.89 for costs incurred by the *Short* firms.  And the Court awards the requested class-representative service awards of $5,000 and $3,500.

## I.      BACKGROUND

As its name suggests, this automotive class action (*Engine II*) is closely related to another automotive class action: *In re: Kia Engine Litigation* (*Engine I*), No. 8:17-cv-00838-JLS-JDE.  In *Engine I*, the plaintiffs alleged that Defendants' vehicles with Theta 2.0-liter and Theta 2.4-liter gasoline direct injection engines suffer from a rod-bearing

---

[1] At the final fairness hearing, the Court GRANTED Defendants' motion to strike a declaration that Class Counsel filed alongside their reply in support of their fees motion.  (Mot. to Strike, Doc. 127; *see* Klonoff Decl., Doc. 123-1.)  After the hearing, the parties stipulated to withdraw the declaration.  (Stipulation to Withdraw, Doc. 146; Order Granting Stipulation to Withdraw, Doc. 148.)  Therefore, in ruling on the fees motion, the Court did not consider the withdrawn declaration or any references made to it in Class Counsel's reply.

defect.  (*Engine I*, Doc. 132 at 1 ¶¶ 20–23 & Doc. 201 at 4.)  The *Engine I* parties moved for preliminary approval of a class action settlement in October 2019; the Court granted preliminary approval in May 2020; and the Court granted final approval in May 2021. (*Engine I*, Docs. 112, 132 & 201.)  The following law firms ("*Engine I* firms") represented the plaintiffs in *Engine I*:

- Sauder Schelkopf LLC;
- Hagens Berman Sobol Shapiro LLP;
- The Law Office of Adam R. Gonnelli;
- Walsh PLLC; and
- Nye, Stirling, Hale, Miller & Sweet, LLP.[2]

### A. Consolidated Actions

*Engine II* consists of the following, consolidated actions.

#### 1. *Flaherty*

In December 2018, while *Engine I* was still ongoing, one of the *Engine I* Firms (Hagans Berman) filed *Flaherty et al. v. Hyundai Motor Company, et al.*, No. 8:18-cv-02223-JLS-JDE, in the Central District of California.  (*Flaherty*, Doc. 1.)  *Flaherty* alleged the same defect as *Engine I* but covered vehicles not at issue in the former action.  While *Flaherty*'s proposed class (like that in *Engine I*) included vehicles equipped with Theta II engines, *Flaherty*'s proposed class extended beyond *Engine I* to also include vehicles with Gamma engines, Nu engines, and Lambda II engines.  (*Id.* ¶¶ 36–39.)

#### 2. *Short*

In March 2019, a related action was filed in the Western District of Washington: *Short et al v. Hyundai Motor America Inc et al*, No. 2:19-cv-00318-JLR.  (*Short*, Doc. 1.)  As pleaded, *Short* concerned different defects than *Engine I* and *Flaherty*—alleging an unknown defect, a catalytic-converter defect, and an oil-pan defect.  (*Id.* ¶ 60-N.)  *Short*'s

---

[2] Other law firms were involved in *Engine I*; this list includes only those firms that are also involved in *Engine II*.

proposed class of vehicles did, however, overlap with the *Flaherty* proposed class. (*Compare Short*, Doc. 1 ¶ 60-N (2012–2016 Kia Soul, 2011–2012 Kia Sportage, and 2011–2013 Hyundai Tucson), with *Flaherty*, Doc. 1 at 1.n1 (2012–2019 Kia Soul and 2011–2019 Kia Sportage).)   And through discovery, *Short* came to focus on the same rod-bearing defect as *Engine I* and *Flaherty*.   (*See Short*, Doc. 42 at 17–18.)   The following law firms ("*Short* firms") represented the plaintiffs in *Short*:

- Keller Rohrback LLP;
- Bailey Glasser LLP; and
- Beasley, Allen, Crow, Methvin, Portis & Miles P.C.

### 3. *Marbury*

In February 2021, the *Engine I* firms (except Hagens Berman) filed *Marbury et al. v. Hundai Motor America et al.*, No. 8:21-cv-00379-JLS-JDE (C.D. Cal.).   Like *Engine* I and *Flaherty*, *Marbury* alleged a rod-bearing defect.   (*Marbury*, Doc. 1 ¶¶ 114–123.)   But *Marbury* covered a different set of vehicles than those actions: vehicles with multi-point injection ("MPI") engines.   (*Id.* ¶ 1.)

### 4. *Thornhill*

In March 2021, Hagens Berman filed *Thornhill et al. v. Hundai Motor Company et al.*, No. 8:21-cv-00481-JLS-JDE (C.D. Cal.).   *Thornhill* also alleged a rod-bearing defect. (*Thornhill*, Doc. 1 ¶ 3.)   *Thornhill*'s putative class covered vehicles with gasoline direct injection ("GDI") engines and MPI engines (also at issue in in *Marbury*).

### 5. *Buettner*

In June 2021, the *Short* firms filed *Buettner v. Hyundai Motor America, Inc. et al.*, No. 8:21-cv-01057-JLS-JDE (C.D. Cal.).   Unlike the initial complaint in *Short*, this action alleged a rod-bearing defect from the start.   (*Buettner*, Doc. 1 ¶¶ 35–40.)   *Buettner*'s putative class covered Theta II 2.0- and 2.4-liter engines (at issue in *Engine I* and *Flaherty*) and MPI engines (at issue in *Marbury* and *Thornhill*).   (*Id.* ¶ 1.)

### B. Procedural History

#### 1. *Flaherty*, *Marbury*, and *Thornhill*

*Flaherty*, *Marbury*, and *Thornhill*—each filed by one or more of the *Engine I* firms—were essentially stayed from their start pending approval of the settlement reached in *Engine I*.  As a result, there was no motions practice and no discovery exchanged between the parties in these actions.  (Morgan Decl., Doc. 120-1 ¶ 14.)

*Flaherty* was filed in December 2018.  The next month, the parties stipulated to extend Defendants' time to respond to the complaint because "the parties in [*Engine I*] [were] currently engaged in settlement negotiations and expect to file a motion for preliminary approval."  And in October 2019, the parties stipulated to stay all deadlines pending approval of the motion for preliminary approval of the class action settlement in *Engine I*.  (*Flaherty*, Docs. 1, 26 & 38.)

*Marbury* and *Thornill* were filed later than *Flaherty* but followed a similar track. *Marbury* was filed in February 2021.  In April 2021, the parties stipulated to extend Defendants' time to respond to the complaint because the parties were "exploring potential resolution."  (*Marbury*, Docs. 1 & 39.)  *Thornhill* was filed in March 2021.  In June 2021, the parties stipulated to extend Defendants' time to respond to the complaint because "the parties continue to engage in productive discussions concerning a possible class resolution."  (*Thornhill*, Docs. 1 & 25.)

In June 2021, the plaintiffs in *Flaherty*, *Marbury*, and *Thornill* moved for these three actions to be consolidated.  (*Flaherty*, Doc. 48.)

#### 2. *Short* and *Beuttner*

Unlike the three above actions, there was significant motions practice and discovery in *Short*.  Defendants filed three motions to dismiss; the plaintiffs amended their complaint in response to the first motion, and the parties fully briefed the latter two.  (*See Short*, Docs. 37, 42, 43, 44, 46, 71, 78 & 82.)  The parties then engaged in expert and non-expert discovery in preparation for the plaintiffs' motion for class certification (Cappio Decl.,

Doc. 106-7 ¶¶ 8–9, 11, 13; Boggs Decl., Doc. 106-9 ¶ 14.)  The plaintiffs' motion was due by October 1, 2021.  (*Short*, Docs. 103 & 104.)

About two weeks before that deadline, the parties in *Short* stipulated to stay all deadlines pending the Court's ruling on the motion for preliminary approval of a class action settlement in *Engine II* (*Short*, Doc. 107.)  Then, in May 2022, the *Short* parties stipulated to transfer and consolidation with *Engine II*.  (*Short*, Docs. 112–114.)

*Buettner* proceeded along the lines of *Flaherty*, *Marbury*, and *Thornhill*.  In August 2021, the parties stipulated to extend Defendants' time to respond to the complaint, referencing the parties' "productive discussions concerning a possible class resolution." (*Beuttner*, Doc. 44.)  And that same month, the parties stipulated to consolidate *Beuttner* with *Engine II*.  (*Beuttner*, Docs. 44 & 46.)

### C. Preliminary Approval of the Settlement

In September 2022, after the above actions had been consolidated, Plaintiffs moved for preliminary approval, which the Court granted in February 2023.  (Prelim. Approval Mot., Doc. 79; Prelim. Approval Order, Doc. 99.)

The Settlement Agreement in this action is "substantially similar" to that reached in *Engine I*.  (Prelim. Approval Order, Doc. 99 at 20.)  The Settlement Agreement provides nine categories of relief:

- A 15-year or 150,000 mile extended warranty covering "all costs associated with inspections and repairs . . . caused by connecting rod bearing failure";
- Recalls and product improvements of certain models;
- Reimbursement for qualifying repairs at authorized dealerships and repair shops and additional goodwill payments for class members denied in-warranty repair at authorized dealerships;
- Repair-related transportation and towing reimbursements for qualifying repairs;
- Goodwill payments for inconvenience due to repair delays;

- Reimbursement for incidental expenses arising out of a qualifying failure or fire, including transportation, lodging, and meals;
- Reimbursement for lost value plus a $150 payment for class vehicles sold or traded in after experiencing a qualifying failure or qualifying fire before the notice date without receiving the recommended repair;
- Goodwill payments of $150 and reimbursement of the maximum Black Book value of the class vehicle at the time of loss minus any value received for the vehicle for class vehicles destroyed by a qualifying fire;
- A rebate program for class members who experience a qualifying failure or qualifying fire, or who lose faith in their class vehicle because of the settlement, sell their class vehicle, and purchase a replacement Hyundai or Kia.

(*Id.* at 4–7, 19.)  The terms of the *Engine II* settlement differ from those of the *Engine I* settlement only in the following respects.  First, the *Engine II* settlement provides a 15-year or 150,000-mile extended warranty, while the *Engine I* settlement provided a lifetime warranty.  (Joint Supp. Br., Doc. 94 at 10–12.)  Second, *Engine II* adopted a more objective definition of the exceptional-neglect exception to eligibility for relief.  (*Id.* at 12–14.)  Third, the *Engine II* settlement offers an expanded set of reimbursements for incidental expenses.  (*Id.* at 14–16.)  Fourth, while eligibility for relief in both the *Engine I* and *Engine II* settlements requires a class member to have first had the knock sensor detection system ("KSDS") installed; *Engine II* provides class members a wider window in which to do so.  (*Id.* at 16–17.)

### D.  Notice

In its preliminary approval order, the Court also approved the proposed form and method of notice, which disseminated notice by mail, email, and a dedicated settlement website.  (*Id.* at 23–25.)  In October 2023, the parties informed the Court that, due to a system error, owners and lessees of certain class vehicles had not yet received notice and

proposed a supplemental notice directed at those inadvertently omitted class members. (Joint Notice of Inadvertent Omission, Doc. 149.)  The Court approved the parties' proposed supplemental notice, and notice packets were disseminated to the previously omitted class members on November 22, 2023.  (Order Approving Supp. Notice, Doc. 154; Status Report re: Supp. Notice, Doc. 155.)

## II.    CERTIFICATION FOR SETTLEMENT PURPOSES ONLY

In its preliminary approval order, the Court certified the class under Rule 23(b)(3) for settlement purposes only.  (Prelim. Approval Order, Doc. 99 at 8–12.)  Nothing since the preliminary approval order suggests that the Court should depart from its previous conclusions on the existence of a valid class.  The Court therefore incorporates its prior class certification into the current Order.  (*See id.*)

At the final fairness hearing, the Court expressed one concern about the class definition: whether vehicles that do not qualify for the extended warranty (*i.e.*, either are more than 15 years old or have more than 150,000 miles) should be removed from the class.  Class Counsel's response was twofold: first, that such vehicles comprise only a small fraction of the class; and, second, that the Settlement Agreement still provides meaningful relief to owners of such vehicles, as they are eligible for the eight other categories of relief.  The Court is satisfied with Class Counsel's response to its concern and finds that such vehicles are appropriately included in the class definition.

## III.   FINAL APPROVAL OF THE CLASS ACTION SETTLEMENT

Before approving a class action settlement, the Court must determine whether the proposed settlement is fair, reasonable, and adequate.  Fed. R. Civ. P. 23(e)(2).  To do so, the Court "must consider a number of factors, including: [1] the strength of plaintiffs' case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the risk of maintaining class action status throughout the trial; [4] the amount offered in settlement; [5] the extent of discovery completed, and the stage of the proceedings; [6] the experience and views of counsel; [7] the presence of a governmental participant ; and [8] the reaction

of the class members to the proposed settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003) (cleaned up).  "The relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case." *Officers for Justice v. Civil Servs. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982).  "It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness, and the settlement must stand or fall in its entirety." *Staton*, 327 F.3d at 960 (cleaned up).

Additionally, where, as here, "a settlement agreement is negotiated *prior* to formal class certification," the Court must also satisfy itself that the settlement is not "the product of collusion among the negotiating parties." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946–47 (9th Cir. 2011) (citation omitted).  Accordingly, the Court must look for explicit collusion and "more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Id.* at 947 (citation omitted).  Such signs include (1) "when counsel receive a disproportionate distribution of the settlement"; (2) "when the parties negotiate a 'clear sailing' arrangement providing for the payment of attorneys' fees separate and apart from class funds"; and (3) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund." *Id.* (citations omitted).

In its preliminary approval order, the Court evaluated the *Staton* factors identified above to determine whether the Settlement Agreement is fair, reasonable, and adequate under Rule 23.  (Prelim. Approval Order, Doc. 99, at 15–21.)  The Court determined that the following factors weighed in favor of approval: (1) the strength of Plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; and (6) the experience and views of counsel.  (*Id.* at 16–21.)  The Court was also satisfied that there

were no signs of collusion between the parties, noting that the Settlement Agreement was the result of a mediation held before a private meditator.  (*Id.* at 21.)  The Court sees no reason to depart from its previous conclusion as to the above *Staton* factors or the lack of signs of collusion.  The Court incorporates its analysis from its preliminary approval order into this Order.  (*See id.* at 13–15.)

At the time of preliminary approval, the Court could not yet assess the class members' reactions to the proposed Settlement Agreement.  The notice process has concluded, so the Court now evaluates that factor.

## A.  Class Declarations

In its preliminary approval order, the Court required Class Counsel to submit declarations from class members discussing their reactions to the Settlement Agreement. (Prelim. Approval Order, Doc. 99 at 21.)  To meet this requirement, Class Counsel sent a survey to a randomly selected sample of 2000 class members who submitted claims. (Berman Decl., Doc. 105-1 ¶ 11–12.)  Class Counsel asked class members who completed the survey to submit a declaration containing their opinions about the proposed Settlement Agreement—including whether they support approval of the settlement and whether they find the relief provided by the settlement to be fully satisfactory.  (*Id.* ¶ 13.)

A total of 589 class members submitted declarations.  (*Id.* ¶ 14.)  Of this total, 380 class members (about 65%) found the Settlement Agreement fully satisfactory.  (*Id.*)  577 class members (about 98%) supported the Settlement Agreement, though a portion of those class members found the Settlement Agreement to be unsatisfactory.  (*Id.*)  And just 12 class members (about 2%) opposed the Settlement Agreement.  (*Id.*)

Given that nearly two-thirds of the declarants found the Settlement Agreement to be fully satisfactory, and almost all of the declarants supported the Settlement Agreement, the Court finds that the declarations weigh in favor of approval.

## B.  Exclusions

The class contains about 2 million class vehicles.  (Defs.' Notice Re Settlement

Exclusions, Doc. 129 at 1.)  Of that total, Defendants received only 287 exclusion requests. (*Id.*)  That means that only 0.014 percent of the class opted out of the Settlement Agreement.  This limited number of exclusions weighs in favor of approval.

### C. Objections

Class Counsel received only twenty-six timely objections.  (Supp. Br. ISO Approval, Doc. 131 at 1; Walsh Decl., Doc. 131-1 ¶ 3; Objections, Doc. 135-2.)  This small number of objections "raises a strong presumption that the terms of a proposed class settlement are favorable to the class members."  *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (citations omitted).  Moreover, as explained further below, the Court finds that none of the objections calls into question the adequacy of the Settlement Agreement.

### 1.  Complaints Outside the Scope of the Settlement

First, many objectors raise complaints that are simply not relevant to assessing the adequacy of the settlement reached here.  Several objections discuss issues with their vehicles that do not stem from the rod-bearing defect that is the subject of the Settlement Agreement.  For example, some objections mention increased fuel consumption, steering-wheel issues, and increased risk of theft.[3]  Similarly, two objectors argue that the Settlement Agreement insufficiently compensates class members for the risk of personal injury.[4]  But vehicle issues unrelated to the rod-bearing defect and claims for personal injury are not subject to the Settlement Agreement's release of claims.  (*See* Settlement Agreement, Doc. 79-2 at 40–43.)  Objectors remain free to pursue such claims in other actions if they so choose.  Therefore, these objections are OVERRULED.

---

[3] *See* McLeod (Objections, Doc. 131-2 at 28) (engine passed compression test); O'Neil (*id.* at 37) (engine passed rod-bearing clearance test); Roenke (*id.* at 98) (check-engine codes unrelated to rod-bearing defect); Brown (*id.* at 104) (fuel consumption); James (*id.* at 120) (acceleration and steering issues); Jorgensen (*id.* at 142) (catalytic-converter failure and transmission issues); Teuber (*id.* at 164) ("other engine parts . . . fail[ed]" and "other issues like overheating" occurred); Burroughs (*id.* at 274) (oil consumption).

[4] James (*id.* at 120) (theft and personal injury); Jorgenson (*id.* at 142) (theft).

### 2. Dissatisfaction with the Settlement's Relief

Second, many objectors express dissatisfaction with the type and amount of relief that the Settlement Agreement provides class members, with that dissatisfaction falling into the following three categories:

- General Dissatisfaction: Several objections seek additional forms of relief (*e.g.*, compensation for used vacation days, parking expenses, buybacks of all class vehicles, and cash payments to all class members) or complain that the Settlement Agreement provide insufficient accountability for what they believe to be wrongful conduct by Defendants.[5]

- Extended-Warranty Length: Several objections take issue with the 15-year, 150,000-mile cap on the extended warranty.[6]

- Rebate: Several objectors complain that one category of relief—the new-purchase rebate—is predicated on buying another Hyundai and Kia.[7]

None of these objections call into question the adequacy of the relief provided. As a general matter, a "settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators." *Officers for Just*, 688 F.2d at 625. It will nearly always be the case that "settlement could have been better," *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998), since a settlement is "a yielding of absolutes and an abandoning of highest hopes," *Staton*, 327 F.3d at 959. "But this possibility [of a better, hypothetical settlement] does not mean the settlement presented was not fair, reasonable or adequate." *Hanlon*, 150 F.3d at 1027. Instead, as the Court found in its preliminary approval order, "[t]he settlement is comprehensive in compensating class members for the harms suffered and providing protection against

---

[5] Schiewe & Mays (*id.* at 6); Houston (*id.* at 108); James (*id.* at 120); Pommes (*id.* at 128); Washington (*id.* at 185); Medley (*id.* at 196); Pembroke (*id.* at 210); Burroughs (*id.* at 274).

[6] McLeod (*id.* at 28); Roenke (*id.* at 98); Pomes (*id.* at 128); Houston (*id.* at 108); Zukerberg (*id.* at 177); Hood (*id.* at 217); Kolehama (*id.* at 220); Sara Lindeman (*id.* at 225); Meece (*id.* at 228); Sappington (*id.* at 232); Henderson (*id.* at 236); Suprin (*id.* at 263).

[7] Schiewe & Mays (*id.* at 6); Arcaro (*id.* at 239); Nieman (*id.* at 242).

future harms."  (Prelim. Approval Order, Doc. 99 at 19.)  Additionally, the settlement "is substantially similar to the settlement that the Court approved in *Engine I*."  (*Id.* at 20.)

Moreover, Class Counsel has provided persuasive responses to the latter two, more specific categories of dissatisfaction: the cap on the extended warranty and the rebate. This Settlement Agreement provides a 15-year, 150,000-mile extended warranty, while the *Engine I* settlement agreement provided a lifetime warranty.  The parties represent that this change was the product of communications between NHTSA and Defendants in which NHTSA expressed concerns about lifetime warranties improperly incentivizing drivers to retain older vehicles past their useful lifetimes.  (Supp. Br. re: Objections, Doc. 131 at 4–5.)  Regarding the rebate, the two objections raise a fair point: It is difficult to imagine an individual suffering a qualifying failure or engine fire in their Kia or Hyundai vehicle, losing faith in their Kia or Hyundai vehicle, selling that vehicle, and then—after experiencing all that—once again choosing to purchase a Kia or Hyundai.  That said, this criticism goes to just one of nine categories of relief and does not undermine the overall adequacy of the Settlement Agreement.  Therefore, the objections are OVERRULED.

### 3.  Exceptional-Neglect Carveout

A class member is not eligible for relief if the vehicle reflects "exceptional neglect." (Settlement Agreement, Doc. 79-2 at 8.)  Exceptional neglect requires both (1) an inspection to find "unacceptable lacquering, varnish, or sludge" and (2) "service records [to] demonstrate unacceptable gaps in regular oil changes."  (*Id.* at 6.)

Several objectors take issue with the exceptional-neglect carveout.[8]  The objectors mostly complain that their *particular* repair requests were denied for exceptional neglect. But given substantial engine varnish and the lack of documented oil changes in each instance, a conclusion of exceptional neglect was reasonable.  (*See* Hendrix Engine Photos, Doc. 131-3; Rosengarten Engine Photos, Doc. 131-4).  The objectors also argue more generally that the Settlement Agreement's definition of exceptional neglect allows

---

[8] Pommes (*id.* at 128); Zuckerberg (*id.* at 177); Hendrix (*id.* at 246); Rosengarten (*id.* at 257).

Defendants to deny repairs under that carveout with impunity.  The Court concludes otherwise.  Exceptional neglect requires a two-part finding that looks to objectively verifiable facts: whether a vehicle's engine has an atypical level of varnish or sludge, and whether there are records of regular service for that vehicle.  Moreover, Defendants must provide monthly reports of all denials of warranty extensions due to exceptional neglect. (Settlement Agreement, Doc. 79-2 at 8, 35).  And upon request from Class Counsel, Defendants must provide the documentation forming the basis of such a determination. (*Id.*)  Given both the objective definition of exceptional neglect and the check provided by Class Counsel's supervision, the Court finds that the Settlement Agreement addresses the concerns raised by the objectors.  Therefore, these objections are OVERRULED.

* * *

In light of the above, the Court finds that the reaction of the class supports approval of the Settlement Agreement.[9]  Having found in its preliminary approval order that the other *Staton* factors support approval, the Court now APPROVES the class action Settlement Agreement.

## IV.    THE *ENGINE I* FIRMS' ATTORNEY FEES

Class Counsel request $8,900,000 in attorney fees.  (Atty. Fees Mot., Doc. 106 at 1.)  In support of that request, Class Counsel report a lodestar of $5,102,023.50 and request a positive multiplier of 1.74.  (*See id.* 10.)  Of that total lodestar figure, $1,829,783.50 million is attributable to the work of the *Engine I* firms.  (Atty. Fees Opp., Doc. 120 at 8.)

---

[9] The reaction of the class members who received late notice does not alter the Court's conclusion.  Class Counsel received no timely objections.  (Pls.' Second Supp. Br., Doc. 159 at 2–3.)  And of the eleven additional declarations that Class Counsel received, ten supported approval of the Settlement Agreement.  (*Id.* at 5.)

| Firm | Hours | Lodestar |
|------|-------|----------|
| Hagens Berman | 1355.90 | $733,576.00 |
| Sauder Schelkopf | 876.80 | $660,722.50 |
| Walsh | 389.40 | $266,855.00 |
| Gonnelli | 168.80 | $151,920.00 |
| Nye | 26.20 | $16,710.00 |
| **Total** | **8546.10** | **$1,829,783.50** |

Defendants do not object to the reasonableness of the *Engine I* firms' hourly rates; nor do Defendants object to the reasonableness of the hours that the *Engine I* firms expended in this action.  (*See generally id.*)  Defendants do, however, oppose the request for a positive multiplier of 1.74.  (*See id.* at 20–24.)

Rule 23 permits a court to award "reasonable attorneys' fees . . . that are authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).  Under both federal and California law, the lodestar approach is the primary method of calculating attorney fees where a class action settlement does not establish a common fund.  *See Hensley v. Eckerhart*, 461 U.S. 424 (1983); *Laffitte v. Robert Half Internat. Inc.*, 1 Cal. 5th 480, 489–90 (2016).  The lodestar considers the "number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."  *Hensley*, 461 U.S. at 433.  "The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed."  *Id.*  "Where the documentation of hours is inadequate, the district court may reduce the award accordingly."  *Id.*

"The district court also should exclude from this initial fee calculation hours that were not reasonably expended."  *Id.* at 434 (internal quotations omitted).  "[B]illing judgment is an important component in a fee setting," and "[h]ours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority."  *Id.* (quotations omitted).

The lodestar figure is "presumptively reasonable."  *Ballen v. City of Redmond*, 466 F.3d 736, 746 (9th Cir. 2006).  However, the lodestar figure "may be adjusted upward or downward to account for several factors including the quality of the representation, the

benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." *Hanlon*, 150 F.3d at 1029.  Overall, the primary "touchstone for determining the reasonableness of attorneys' fees in a class action is the benefit to the class.  It matters little that the plaintiffs' counsel may have poured their blood, sweat, and tears into a case if they end up merely spinning wheels on behalf of the class." *Lowery v. Rhapsody Int'l, Inc.*, 75 F.4th 985, 988 (9th Cir. 2023).

The Court awards the *Engine I* firms $1,814,591.50 in attorney fees.  The Court concludes that the *Engine I* firms billed at reasonable rates and, with one exception described below, finds that the hours the *Engine I* firms expended in this action were reasonable.  The Court, however, declines to grant the *Engine I* firms' request for a positive multiplier and instead awards the presumptively reasonable lodestar figure.

### A.  Reasonable Hourly Rates

The Court begins by determining whether the hourly rates claimed by the *Engine I* firms are reasonable.  To do so, courts look to the "rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Camacho v. Bridgeport Fin. Inc.*, 523 F.3d 973, 979 (9th Cir. 2008) (citation omitted).  "[T]he burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Id*. (citing *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984)).  "Affidavits of the plaintiff[s'] attorney and other attorneys regarding prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the plaintiff[s'] attorney, are satisfactory evidence of the prevailing market rate." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990).

The Court concludes that the *Engine I* firms' rates are reasonable.  Class Counsel request partner rates between $625 and $1,285; of counsel rates between $550 and $600; associate rates between $350 and $575; and paralegal rates between $150 and $400.  (Atty.

16

Fees Mot., Doc. 106 at 11–14.)  As mentioned, Defendants do not contest the reasonableness of these hourly rates.  (*See generally* Atty. Fees Opp., Doc. 120.) Moreover, Class Counsel from the *Engine I* firms have a proven track record of successfully litigating consumer class actions, including automotive ones.  (*See* Berman Decl., Doc. 106-1 ¶¶ 4–5; Hagens Berman Firm Resume, Doc. 106-2; Walsh Decl., Doc. 106-3 ¶ 3; Gonnelli Decl., Doc. 106-4 ¶ 5; Bernal Decl., Doc. 106-5 ¶ 15; Schelkopf Decl., Doc. 106-6 ¶ 7.)   And courts, including this Court in *Engine I*, have approved the firms' rates.  (*See Engine I*, Doc. 201 at 41–42; Berman Decl., Doc. 106-1 ¶ 21 & n.2; Walsh Decl., Doc. 106-3 ¶ 5; Bernal Decl., Doc. 106-5 ¶ 15; Schelkopf Decl., Doc. 106-6 ¶ 8.)

### B.  Hours Reasonably Expended

The Court now turns to whether the hours that the *Engine I* firms expended on this action were reasonable.  While the Court finds the hours to generally be reasonable, the Court finds it necessary to reduce the hours reported by Gonnelli.

It is improper to "bill[] routine, administrative, [and] easily delegable tasks at a partner rate."  *Scott*, 2017 WL 7049524, at *8.  Here, Gonnelli regularly did so.  For example, he "added exhibit CVs" to a mediation brief (Gonnelli Time Records, Doc. 140-6 at 1/6/22); drafted a deposition notice (*id.* at 10/27/22); "finalize[d] and serve[d] subpoenas" (*id.* at 6/4/23–6/15/23); spent hours preparing and editing spreadsheets (Gonnelli Supp. Time Records, Unfiled Doc. at 6/28/23, 7/2/23); "assemble[d] exhibits" and redacted documents (*id.* at 7/7/23); and checked cross-references in filings (*id.*).  To account for these hours, the Court applies a 10% reduction to Gonnelli's hours, producing the following lodestar for the *Engine I* firms:

| Firm | Hours | Lodestar |
|---|---|---|
| Hagens Berman | 1355.90 | $733,576.00 |
| Sauder Schelkopf | 876.80 | $660,722.50 |
| Walsh | 389.40 | $266,855.00 |
| Gonnelli | 168.80 | $136,728.00 |
| Nye | 26.20 | $16,710.00 |
| **Total** | **8546.10** | **$1,814,591.50** |

### C. Multiplier

The Court rejects the request for a positive multiplier and awards the *Engine I* firms the presumptively reasonable lodestar figure.  First, the Court finds that the *Engine I* firms conducted this litigation in a manner reasonably expected of experienced counsel—with that experience reflected in the rates the Court found to be reasonable.  (*Supra* part IV.A.) Second, the complexity and novelty of this case does not warrant a multiplier.  The Court's observation from *Engine I* is even more true here: "Class Counsel have litigated, and this Court has presided over, many automotive defect class actions, and Class Counsel have not pointed to anything that makes this one particularly novel or complex compared to other automotive defect class actions."  (*Engine I*, Doc. 201 at 44.)  Third, as the Court also concluded in *Engine I*, a "risk multiplier[] [is] inappropriate in statutory fee cases" like this one.  (*Id.*)  Fourth, while the Settlement Agreement achieved a substantial recovery for the class, this factor does not overcome the three previous factors that weigh against the application of a positive multiplier.  Instead, the Court concludes that the "presumptively reasonable" lodestar figure is appropriate here.  *Ballen*, 466 F.3d at 746.

\* \* \*

For the above reasons, the Court awards the *Engine I* firms $1,814,591.50 in attorney fees.

## V.     THE *SHORT* FIRMS' ATTORNEY FEES

The *Short* firms report a lodestar of $3,272,240 and request a positive multiplier of 1.74.  (*See* Atty. Fees Mot., Doc. 106 at 10–14.)

| Firm | Hours | Lodestar |
|---|---|---|
| Keller Rohrback | 4129.20 | $2,202,035.50 |
| Bailey Glasser | 788.40 | $520,024.50 |
| Beasley Allen | 811.40 | $550,180.00 |
| **Total** | **8546.10** | **$3,272,240.00** |

18

Defendants argue that the Court should not award the *Short* firms any attorney fees
or that, at minimum, the Court should significantly discount the attorney fees that the *Short*
firms request.  Specifically, Defendants argue that the *Short* firms litigated in an inefficient
manner, did not contribute to the settlement reached in this action, and unreasonably
delayed consolidation.  (Atty. Fees Opp., Doc. 120 at 11–18, 24–25.)

The Court awards the *Short* firms $1,590,308.64 in attorney fees.  While the Court
finds that the *Short* firms' hourly rates are reasonable, the Court concludes that not all of
the *Short* firms' hours were reasonably expended because the *Short* firms engaged in
constant, intra-office "strategy" conferences and because the *Short* firms frequently
reported their hours in a block-billed format.  Moreover, the Court concludes that a
negative multiplier is appropriate as to the *Short* firms.

### A.  Reasonable Hourly Rates

The Court finds the *Short* firms' hourly rates to be reasonable.  Class Counsel
request partner rates between $690 and $1,325; associate rates between $500 and $650;
and paralegal rates between $250 and $400.  (Atty. Fees Mot., Doc. 106 at 11–14.)
Defendants do not contest the reasonableness of these hourly rates.  (*See generally* Atty.
Fees Opp., Doc. 120.)  Class Counsel from the *Short* firms have experience litigating
consumer class actions.  (*See* Cappio Decl., Doc. 106-7 ¶ 4; Keller Firm Resume, Doc.
106-8; Boggs Decl., Doc. 106-9 ¶¶ 3, 5–9; Barnett Decl., Doc. 106-10 ¶ 3.)  And courts
have approved the *Short* firms requested rates in similar actions.  (*See* Cappio Decl., Doc.
106-7 ¶ 25; Cappio Decl., Doc.106-7 ¶ 10.)

### B.  Hours Reasonably Expended

The Court applies two percentage decreases to the hours that the *Short* firms report:
one for inefficient litigation, and another for frequent block-billing.

### 1.   The *Short* Firms' Inefficient Litigation

Defendants argue that the *Short* firms' hours should be reduced because they frequently engaged in inefficient, intra-office "strategy" conferences for which a paying client would not compensate counsel.  (Atty. Fees Opp., Doc. 120 at 15–18.)

Courts exclude hours that are "excessive, redundant, or otherwise unnecessary." *Gonzalez*, 729 F.3d at 1202.   While some amount of strategy conferences will undoubtedly be necessary when litigating a complex class action, a reduction is necessary when time records "reflect a high degree of strategy conferencing and discussions . . . at seemingly every point in th[e] litigation."  *Aikens v. Malcolm Cisneros*, No. 5:17-cv-02462-JLS-SP, 2020 WL 10828062, at *7 (C.D. Cal. Jan. 2, 2020) (cleaned up); *see also Lusk v. Five Guys Enterprises LLC*, No. 1:17-cv-0762 JLT EPG, 2023 WL 4134656, at *26 (E.D. Cal. June 22, 2023) ("many courts have . . . reduced fee awards for time spent in 'interoffice conferences' or other internal communications"); *In re Magsafe Apple Power Adapter Litig.*, No. 5:09-CV-01911-EJD, 2015 WL 428105, at *13 (N.D. Cal. Jan. 30, 2015) (reducing hours because "the partners, in particular, spent an unreasonable amount of time conferring with co-counsel"); *Hernandez v. Grullense*, No. 12-cv-03257-WHO, 2014 WL 1724356, at *10 (N.D. Cal. Apr. 30, 2014) (reducing hours to account for "unnecessary and duplicative intra-office conferences").  Such reductions are generally about ten percent.  *See Aikens*, 2020 WL 10828062, at *7 (imposing 10% haircut); *Lusk*, 2023 WL 4134656, at *27 (same).

Here, the Court finds a 10% reduction of the *Short* firms' hours to be appropriate. "[A]t seemingly every point in th[e] litigation," the *Short* firms conducted nondescript strategy conferences. (*See, e.g.*, Keller Entries, Doc. 140-3 at 03/06/2019, 03/07/2019, 04/18/2019; 04/22/2019; Bailey Entries, Doc. 140-4 at 08/04/2020, 07/27/2021; 05/25/2021; Beasley Entries, Doc. 140-5 at 07/20/2020, 07/30/2020).  This 10% reduction of the *Short* firms' hours produces the following lodestar:

| Firm | Hours |
|------|-------|
| Keller Rohrback | $1,981,831.95 |
| Bailey Glasser | $468,022.05 |
| Beasley Allen | $495,162.00 |
| **Total** | **$2,945,016.00** |

### 2.  The *Short* Firms' Block-Billing

The Court also finds it appropriate to reduce the *Short* firms' hours due to their frequent block-billing.  Courts discount counsel's hours where a large portion of counsel's time entries are block-billed because that practice "mak[es] it difficult to evaluate the reasonableness of the hours requested."  *Custer v. Cristo Armstrong Powers, Inc.*, No. 8:20cv-00154-JLS-ADS, 2020 WL 8028236, at *2 (C.D. Cal. Nov. 17, 2020).  The Ninth Circuit has credited a report estimating that block-billing "may increase time by 10% to 30%," *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007), and it has approved of block-billing discounts of up to 30%, *Lahiri v. Universal Music & Video Distribution Corp.*, 606 F.3d 1216, 1223 (9th Cir. 2010).  Here, the Court finds that an across-the-board 10% cut is appropriate given that Class Counsel frequently block-billed. (*See, e.g.*, Keller Entries, Doc. 140-3 at 03/06/2019, 03/07/2019, 03/25/2019, 04/03/2019; Bailey Entries, Doc. 140-4 at 12/15/2020, 12/04/2019, 11/04/2019, 10/12/2020, 8/28/2019, 8/6/2021).  This reduction produces the following lodestar:

| Firm | Hours |
|------|-------|
| Keller Rohrback | $1,783,648.76 |
| Bailey Glasser | $421,219.85 |
| Beasley Allen | $445,645.80 |
| **Total** | **$2,650,514.40** |

### 3.  *Short*'s Delayed Consolidation

Defendants argue that the Court should discard or reduce the *Short* firms' hours because "[t]he *Short* firms conveniently ignore that they chose to continue litigating *Short*

despite knowing *Engine II* overlapped with their claims in *Short* and was heading toward class settlement." (Atty. Fees Opp., Doc. 120 at 13.)  The Court, however, finds that there was gamesmanship on both sides and that both sides share blame for the failure to consolidate *Short* and *Engine II* earlier.  (*See, e.g.*, *Short*, Doc. 19 (Defendants—proposing coordination with *Engine I* and *Flaherty*); *Short*, Doc. 20 (Plaintiffs—opposing coordination); *Short*, Doc. 92 (Defendants—opposing consolidation with *Marbury* and *Thornhill* because it "would not avoid conflicts, conserve resources or promote an efficient determination of the action"); *Short*, Doc. 93 (Plaintiffs—suggesting meet and confer regarding coordination with *Marbury* and *Thornhill*).).  Given that both sides bear responsibility for the delayed consolidation, the Court declines Defendants' request to discard or reduce the *Short* firms' hours on this ground.

* * *

For the above reasons, the Court finds the lodestar figure for the *Short* firms to be $2,650,514.40.

### C. Multiplier

The Court rejects Class Counsel's request for a positive multiplier and instead imposes a negative multiplier as to the *Short* firms.  The Court previously assessed the *Hanlon* factors and concluded that, as to the *Engine I* firms, no multiplier was appropriate. (*Supra* part IV.C.)  As to the *Engine I* firms, the Court found only one factor to counsel in favor of a positive multiplier (the results obtained for the class), concluded that the remaining factors pointed toward no multiplier, and ultimately awarded the *Engine I* firms their lodestar without any multiplier.  But as to the *Short* firms, the results-obtained factor overwhelmingly warrants a negative multiplier because the *Short* firms' pre-consolidation litigation did not meaningfully affect the Settlement Agreement reached in this case.

As mentioned, the primary "touchstone for determining the reasonableness of attorneys' fees in a class action is the benefit to the class."  *Lowery*, 75 F.4th at 988. Therefore, attorneys do not get credit for "merely spinning wheels on behalf of the class,"

22

*id.*, and a district court can exclude "attorney time spent on services [that] produce no tangible benefit for the client," *Van Lith v. iHeartMedia + Ent., Inc.*, No. 1:16-cv-00066-SKO, 2017 WL 4340337, at *16 (E.D. Cal. Sept. 29, 2017).

Here, Defendants make the categorical argument that *Short* played no role whatsoever in the settlement reached in this case. (*See* Atty. Fees Opp., Doc. 120 at 1 ("Nor should [D]efendants be required to pay for [P]laintiffs' work in *Short* because it did not contribute to the settlement.").[10]  In support of this contention, Defendants note that "all but one of the *Engine II* settlement benefits came directly from [the] *Engine I*" settlement. (*Id.* at 11–12.)  Defendants also highlight that the inclusion of *Short* did not increase the scope of the vehicle class, as the vehicles at issue in *Short* overlapped with the vehicles in *Flaherty* and *Marbury*. (*Id.* at 12.)  Moreover, Defendants contend that the *Short* firms' contributions to the settlement were necessarily limited because *Short* alleged a different defect than the remaining actions and arrived at the connecting-rod-bearing defect only after discovery. (*Id.*)  Finally, Defendants argue that *Short*'s discovery did not narrow the confirmatory discovery needed here, since the *Engine II* and *Engine I* confirmatory discovery was "virtually identical." (*Id.* at 12–13.)

Class Counsel respond that the expert discovery conducted in *Short* helped confirm "which vehicles were affected by the alleged defect[] and the nature of the defect." (Reply ISO Fees Mot., Doc. 123 at 5.)  The *Short* firms also highlight representations from the *Engine I* firms that the *Short* discovery "proved very valuable at the settlement stage" and was "rel[ied] upon" by Class Counsel. (*Id.*; Berman Decl., Doc. 106-1 ¶ 14; Schelkopf Decl., Doc. 106-6 ¶ 21.)  And Class Counsel contend that *Short*—particularly its looming class-certification deadline—provided critical settlement pressure and leverage. (Reply ISO Atty. Fees Mot., Doc. 123 at 1–2, 6; Berman Supp. Decl., Doc. 123-3 ¶ 6.)

---

[10] In their opposition, Defendants frame this argument as informing whether the *Short* firms' hours were reasonably incurred.  The Court, however, finds this argument to be more properly situated within the multiplier inquiry.

The Court finds the truth of the matter to lie somewhere between these two polar-opposite positions.  While the *Short* firms played little to no role in shaping the *terms* of the Settlement Agreement, they may have impacted the *timing* of the settlement.

The fact that the settlement here is nearly identical to *Engine I*'s settlement is strong evidence that the *Short* firms—who, unlike the rest of Class Counsel, were not involved in *Engine I*—had little effect on the actual terms of the Settlement Agreement.  Moreover, while Class Counsel contend that the discovery in *Short* streamlined the necessary confirmatory discovery here, the confirmatory discovery actually conducted calls that suggestion into question.  As Defendants note, the confirmatory discovery requested here was "virtually identical" to that of *Engine I*, with fourteen of the seventeen requests for production taken verbatim from *Engine I* and the same two depositions taken in both actions.  (Morgan Decl., Doc. 120 ¶ 17.)

Similarly, the Court rejects the *Short* firms' suggestion that, without the looming class certification deadline in *Short*, this action would not have settled.  Defendants and the *Engine I* firms settled *Engine I*—with the parties moving for preliminary approval in October 2019 and the Court granting final approval in May 2021.  (*Engine I*, Docs. 112, 132 & 201.)  And before the various actions now comprising *Engine II* were consolidated, Defendants and the *Engine I* firms moved for stays in *Flaherty*, *Marbury*, and *Thornhill*—citing the then-pending settlement in *Engine I*.  (*Supra* part I.B.)  To adopt the *Short* firms' causal argument, the Court would have to assume that Defendants and the *Engine I* firms acted unreasonably by moving for a stay with the belief that the *Engine I* settlement would translate into a settlement in *Engine II* without significant motions practice or discovery.  The Court declines to do so.

But the Court does find persuasive Class Counsel's contention that the looming class-certification deadline in *Short* impacted the timing of the Settlement Agreement's finalization.  As a general matter, "[t]he decision to certify a class thus necessarily places pressure on the defendant to settle."  *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708,

722 (9th Cir. 2010) (citation omitted).  Moreover, the timing of the settlement here supports Class Counsel's argument.  The deadline to file a class-certification motion in *Short* was October 1, 2022.  (*Short*, Docs. 103–104.)  *Flaherty*, *Thornhill*, and *Marbury* were filed in 2018 (the first action) and 2021 (the latter two).  Settlement negotiations began in earnest in early 2022 at a mediation.  (*See* Prelim. Approval Mot., Doc. 79 at 5.)  And while the parties reached a general framework for settlement at that mediation, it was not until September 2022 that the parties actually formalized an agreement—a month before the motion for class certification was due in *Short*.  (*See id.*)  The temporal proximity of the Settlement Agreement to the *Short* class-certification deadline suggests that the deadline did affect the timing of the settlement—particularly given the years-long life of this case and the several-months-long nature of the settlement negotiations.

Therefore, the Court rejects Defendants' request to not compensate the *Short* firms at all.  But the Court does find it appropriate to apply a negative multiplier to the *Short* firms' lodestar to account for the fact that the litigation in *Short* played a meaningful role only in the timing of the settlement reached here, not its actual terms.

Defendants estimate that about 80% of the *Short* firms' hours were related only to *Short*—a characterization that Class Counsel does not contest.  (*See* Atty. Fees Opp., Doc. 120 at 13; *see generally* Atty. Fees Reply, Doc. 123.)  As to that 80% of hours, the Court applies a 0.5 multiplier, producing an award of $1,590,308.64 for the *Short* firms.

| Firm | Hours |
|------|-------|
| Keller Rohrback | $1,070,189.25 |
| Bailey Glasser | $252,731.91 |
| Beasley Allen | $267,387.48 |
| **Total** | **$1,590,308.64** |

## VI.   TOTAL ATTORNEY FEES: COMPARISON TO *ENGINE I*

As explained above, the Court awards $1,814,591.50 in attorney fees to the *Engine I* firms (*supra* part IV) and $1,590,308.64 in attorney fees to the *Short* firms (*supra* part V)

25

for a total of $3,404,900.14 in attorney fees.  The Court finds further support for that total fee award by comparing it to the award in *Engine I* ($6.9 million).  (*Engine I*, Doc. 201 at 47.)[11]  This action involved about half as many class vehicles as *Engine I* (Atty. Fees Opp., Doc. 120 at 1) and, as mentioned, the Settlement Agreement in this case largely mirrored that reached by the parties in *Engine I* (*supra* part V.C).  Therefore, logically, the fee award here should be substantially less than the fees in *Engine I*.  Using *Engine I* as a comparator, the Court finds the approximately $3.4 million figure reached here to be a reasonable (if upper end) attorney fee for Class Counsel.[12]

## VII.   Litigation Costs

Class Counsel request up to $300,000 in litigation costs.  (Atty. Fees Mot., Doc. 106 at 1.)  At the time they filed their motion, Class Counsel had incurred $251,095.87 in costs.

---

[11] The Ninth Circuit has "encourage[d]" district courts to "cross-check the fees" reached using the lodestar method against the fees reached using the percentage-of-the-fund method (or visa-versa).  *Lowery*, 75 F.4th at 991, 993–94.  Class Counsel also urge the Court to perform such a cross-check using their expert's monetary estimate of the Settlement Agreement's value.  (Atty. Fees Mot., Doc. 105 at 22.)  Though the Court recognizes that performing a cross-check is good practice, it declines to do so here because it lacks a reliable estimate of the Settlement Agreement's value.  As the Court explained in *Engine I*, it has "concerns with the reliability of expert valuations of non-monetary benefits" because those estimates "are necessarily based on numerous assumptions that often go unchallenged—given the parties' joint incentive to present a court with a high settlement valuation."  (*Engine I*, Final Approval Order, Doc. 201 at 16.)

[12] After filing their motion for attorney fees, Class Counsel submitted **fourteen** additional spreadsheets of attorney fees.  (*See* Order re: Spreadsheets, Doc. 138 at 1 n.1 (noting that Class Counsel had emailed but not filed on the docket a set of supplemental spreadsheets); Docs. 160-2, 160-4, 160-6, 160-8, 160-10, 160-12, 160-14 (another set of supplemental spreadsheets).)  The Court does not consider these spreadsheets for two independent reasons.  First, because these spreadsheets were submitted in connection with Class Counsel's reply and supplemental brief, Defendants did not have an opportunity to respond to them.  See, e.g., *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1027 (C.D. Cal. 2018) ("New evidence submitted as part of a reply is improper because it does not allow the [non-moving party] an adequate opportunity to respond.")  Second, as indicated above, the fee award here represents the ceiling of what the Court finds to be a reasonable fee in this case; therefore, consideration of Class Counsel's additional hours would not affect the Court's analysis.

(*Id.* at 22–23.)[13]  The *Engine I* firms had incurred $38,857.22 in costs, and the *Short* firms had incurred $212,238.15 in costs.  (Atty. Fees Opp., Doc. 120 at 18.)

Class Counsel are entitled to "reasonable out-of-pocket litigation expenses that would normally be charged to a fee-paying client."  *Trustees of Const. Industry & Laborers Health & Welfare Trust v. Redland Ins. Co.*, 460 F.3d 1253, 1257 (9th Cir. 2006) (citations omitted); *see also* 42 U.S.C. § 2000e-5(k); Fed. R. Civ. P. 23(h) ("In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement.").

The Court GRANTS IN PART Class Counsel's request for costs.  The Court awards the *Engine I* firms the $38,857.72 that they incurred.  And the court applies the same multiplier that it applied to the *Short* firms' attorney fees (0.5 multiplier as to 80% of the amount) to the *Short* firms' costs—bringing the *Short* firms' costs to $127,342.89.  (*Supra* part V.C.)  Therefore, the Court awards Class Counsel $166,200.61 in total costs.

## VIII.  Class-Representative Service Awards

Class-representative service awards are "discretionary . . . and are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general."  *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009) (citation omitted).  "[A]s a general matter, $5,000 is a reasonable amount" for a class-representative service award.  *Vector Marketing Corp.*, No. C-08-5198 EMC, 2012 WL 381202, at *7 (N.D. Cal. Feb. 6, 2012); *see also Smith v. Am. Greetings Corp.*, 2016 WL 362395, at *10 (N.D. Cal. Jan. 29, 2016) ($5,000 service awards are "presumptively reasonable").

Here, Class Counsel request service awards of $5,000 for class representatives who

---

[13] Class Counsel do not explain why they request to be awarded costs above what they had incurred.  (*See generally* Atty. Fees Mot., Doc. 106; Reply ISO Atty. Fees Mot., Doc. 123; *see also* Atty. Fees Opp., Doc. 120 at 18 ("presum[ing]" that the $300,000 figure is a "rounding up" of Class Counsel's costs).

were deposed and service awards of $3,500 for class representatives who were not deposed.  (Atty. Fees Mot., Doc. 106 at 23.)  Class representatives worked with Class Counsel, detailed their experience with the class vehicles, provided documents, reviewed pleadings, and assessed the Settlement Agreement.  (*Id.* at 24.)  Defendants do not oppose the service awards.  (See generally Atty. Fees Opp., Doc. 120.)  The Court GRANTS Class Counsel's request for service awards of $5,000 and $3,500.

## IX.   CONCLUSION

The Court finds the settlement to be fair, adequate, and reasonable.  Moreover, the Court finds that the settlement is not the product of collusion.  Accordingly, the Court GRANTS the motion for final approval of class action settlement.

The Court also GRANTS IN PART the motion for attorney fees, litigation costs, and class-representative service awards.  The Court awards $3,404,900.14 in attorney fees—with $1,814,591.50 attributable to the *Engine I* firms' work, and $1,590,308.64 attributable to the *Short* firms' work.  The Court awards $166,200.61 in litigation costs— with $38,857.72 for costs incurred by the *Engine I* firms, and $127,342.89 for costs incurred by the *Short* firms.  And the Court awards the requested class-representative service awards of $5,000 and $3,500.

Class Counsel is ORDERED to file a proposed final judgment within five (5) days of the entry of this Order.

DATED:  April 9, 2024

_____

HON. JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE